Barry I. Levy, Esq. (BL 2190)
Max Gershenoff, Esq. (MG 4648)
Christina M. Bezas, Esq. (CB 1230)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,

                Plaintiffs,

    -against-

NORTHERN PHYSICAL THERAPY, CHIROPRACTIC, & ACUPUNCTURE, PLLC, SANGWOO MAH, D.C., SEUNG-HYUK CHOI, P.T., SEUNG YONG SONG, L.Ac., HO RHEEM RIM, L.Ac., MARC FELDERSTEIN, D.C., BETHEL ANESTHESIA AND PAIN MANAGEMENT, INC., BETHEL INTERVENTIONAL PAIN MANAGEMENT LLC, and JOHN CHO, M.D.,

                Defendants.

Docket No.: _____(    )

**Plaintiffs Demand a Trial by Jury**

---

## COMPLAINT

    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## **NATURE OF THE ACTION**

1.      This action seeks to recover more than $4,900,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted:

(i)      thousands of fraudulent no-fault insurance charges through Northern Physical Therapy, Chiropractic, & Acupuncture, PLLC ("Northern PT") for purported examinations, range of motion/muscle strength testing, electrodiagnostic ("EDX") testing, chiropractic, physical therapy, and acupuncture services.

(ii)     thousands of fraudulent no-fault insurance charges through Bethel Anesthesia and Pain Management, Inc. ("Bethel Anesthesia") and Bethel Interventional Pain Management, LLC ("Bethel Interventional")(collectively, the "Bethel Practices") for purported examinations, pain management injections, epidurography, and spinal surgical procedures.

(the purported examinations, pain management injections, EDX testing, chiropractic services, physical therapy services, and acupuncture services are referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Northern PT, Bethel Interventional, and Bethel Anesthesia under New York no-fault insurance policies because:

(i)      the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)     the Defendants engaged in an unlawful referral scheme;

(iii)    Bethel Anesthesia had an illegal corporate structure;

(iv)     Bethel Interventional and Bethel Anesthesia failed to meet applicable New York licensing requirements necessary to provide the Fraudulent Services in New York

2

and, as a result, were not eligible to receive no-fault reimbursement for those services in the first instance;

(v)    the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice and, as a result, were not eligible for no-fault reimbursement in the first instance;

(vi)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(vii)    in many cases, the Fraudulent Services never were provided in the first instance; and

(viii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.    Furthermore, GEICO seeks a declaration that Bethel Interventional and Bethel Anesthesia were not in compliance with all significant laws and regulations governing healthcare services providers in New Jersey.

5.    The Defendants fall into the following categories:

(i)    Defendant Northern PT is a New York physical therapy, chiropractic, and acupuncture professional limited liability company, through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(ii)    Defendant Seung-Hyuk Choi, P.T. ("Choi") is a physical therapist licensed to practice physical therapy in New York, was a member of Northern PT, and purported to perform many of the Fraudulent Services on behalf of Northern PT.

(iii)    Defendant Sangwoo Mah, D.C. ("Mah") is a chiropractor licensed to practice chiropractic in New York, was a member of Northern PT, and purported to perform many of the Fraudulent Services on behalf of Northern PT.

(iv)    Defendant Seung Yeon Song, L.Ac ("Song") is an acupuncturist licensed to practice acupuncture in New York, was a member of Northern PT, and purported to perform many of the Fraudulent Services on behalf of Northern PT.

(v)    Defendant Ho Rheem Rim, L.Ac. ("Rim") is an acupuncturist licensed to practice acupuncture in New York, was associated with Northern PT, and purported to perform many of the Fraudulent Services on behalf of Northern PT.

(vi)     Defendant Marc Felderstein, D.C. ("Felderstein") is a chiropractor licensed to practice chiropractic in New York, was associated with Northern PT, and purported to perform many of the Fraudulent Services on behalf of Northern PT.

(vii)    Defendant Bethel Anesthesia is a New Jersey corporation, through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(viii)   Defendant Bethel Interventional is a New Jersey medical professional limited liability company, through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(ix)     Defendant John Cho, M.D. ("Cho") is a physician licensed to practice medicine in New York and New Jersey, owned Bethel Anesthesia and Bethel Interventional, was a member of Bethel Interventional, and purported to perform many of the Fraudulent Services on behalf of Bethel Anesthesia and Bethel Interventional.

6.       As discussed below, the Defendants at all relevant times have known that:

(i)      the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)     the Defendants engaged in an unlawful self-referral scheme;

(iii)    Bethel Anesthesia had an illegal corporate structure;

(iv)     Bethel Interventional and Bethel Anesthesia failed to meet applicable New York licensing requirements necessary to perform the Fraudulent Services in New York and, as a result, were not eligible to receive no-fault reimbursement for those services in the first instance;

(v)      the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice and, as a result, were not eligible for no-fault reimbursement in the first instance;

(vi)     the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(vii)    in many cases, the Fraudulent Services never were provided in the first instance; and

(viii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

7.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" – "3" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the United States mail.

8.     The Defendants' interrelated fraudulent schemes began as early as 2013 and have continued uninterrupted since that time. As a result of the Defendants' schemes, GEICO has incurred damages of more than $4,900,000.00.

**THE PARTIES**

## I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

## II.    Defendants

10.    Defendant Northern PT is a New York chiropractic, physical therapy, and acupuncture professional limited liability company with its principal place of business in New York. Northern PT was organized in New York on or about April 6, 2015, had Mah, Choi, and Song as its members, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.    Defendant Mah resides in and is a citizen of New York. Mah was licensed to practice chiropractic in New York on August 2, 2000. Mah was an owner and member of Northern PT, purported to perform many of the Fraudulent Services billed through Northern PT, and used Northern PT as a vehicle to submit fraudulent billing to GEICO and other insurers.

12.     Defendant Choi resides in and is a citizen of New York. Choi was licensed to practice physical therapy in New York on August 13, 2012. Choi was an owner and member of Northern PT, purported to perform many of the Fraudulent Services billed through Northern PT, and used Northern PT as a vehicle to submit fraudulent billing to GEICO and other insurers.

13.     Defendant Song resides in and is a citizen of New York. Song was licensed to practice acupuncture in New York on January 21, 2010, was an owner and member of Northern PT, purported to perform many of the Fraudulent Services on behalf of Northern PT, and used Northern PT as a vehicle to submit fraudulent billing to GEICO and other insurers.

14.     Defendant Rim resides in and is a citizen of New York. Rim was licensed to practice acupuncture in New York on February 25, 2009. Rim was associated with Northern PT, and purported to perform many of the Fraudulent Services at Northern PT.

15.     Defendant Felderstein resides in and is a citizen of New York. Felderstein was licensed to practice chiropractic in New York on May 21, 1996. Felderstein was associated with Northern PT, and purported to perform many of the Fraudulent Services at Northern PT.

16.     Defendant Bethel Anesthesia is a New Jersey general business corporation with its principal place of business in New Jersey. Bethel Anesthesia was incorporated in New Jersey on or about September 8, 2009, was owned and controlled by Cho, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

17.     Defendant Bethel Interventional is a New Jersey medical professional limited liability company with its principal place of business in New Jersey. Bethel Anesthesia was organized in New Jersey on or about August 21, 2015, had Cho as its member and owner, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

18.     Defendant Cho resides in and is a citizen of New Jersey. Cho was licensed to practice medicine in New Jersey on May 22, 2008, and in New York on May 28, 2009. Cho was the owner of Bethel Anesthesia, the owner and member of Bethel Interventional, and purported to perform many of the Fraudulent Services billed through Bethel Anesthesia and Bethel Interventional in both New York and New Jersey.

19.     Cho obtained board certification in anesthesiology from the American Board of Anesthesiology. Cho's board certification in anesthesiology is the only legitimate board certification that he ever obtained.

### III.     Hudson Terrace Medical, P.A.

20.     Although it has not been named as a Defendant in this action, Hudson Terrace Medical, P.A. ("Hudson Terrace"), a New Jersey surgical practice, is relevant to understanding the Defendants' fraudulent scheme and the claims brought in this action.

21.     Hudson Terrace is a New Jersey medical professional corporation with its principal place of business in New Jersey. Hudson Terrace purported to be properly licensed in New Jersey as a surgical practice. Hudson Terrace was incorporated in New Jersey on or about May 5, 2006, was owned and controlled by Cho, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

22.     At all relevant times, Cho was a significant shareholder of Hudson Terrace. In fact, based on Department of Health filings, Cho has owned between 7.15% and 11% of Hudson Terrace on a consistent basis since at least 2013.

23.     As set forth below, many of the Defendants' fraudulent interventional pain management procedures that were billed through Bethel Anesthesia, Bethel Interventional, and/or Hudson Terrace were performed pursuant to unlawful self-referrals.

**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act). In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and where, as set forth below, a substantial amount of the activities forming the basis of the Complaint occurred.

26.     For example, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

27.     What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

**ALLEGATIONS COMMON TO ALL CLAIMS**

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

28.     GEICO underwrites automobile insurance in New York and New Jersey.

**A.      Pertinent New York Law Governing No-Fault Insurance Reimbursement**

29.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

30.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

31.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those services.

32.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

33.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

34.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable

licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

35.     Pursuant to New York law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530. Therefore, foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

36.     Furthermore, pursuant to New York law, with limited exceptions that are not applicable here, ordinary, non–professional general business corporations may not provide professional medical services. Therefore, ordinary, non–professional general business corporations that provide professional medical services are not eligible to receive PIP Benefits in New York.

37.     Moreover, New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting compensation in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530; 6531; see also 8 N.Y.C.R.R. § 29.1. Therefore, a healthcare provider that pays or receives kickbacks or unlawful compensation in exchange for patient referrals is not eligible to receive PIP Benefits.

38.     In addition, New York law prohibits licensed healthcare services providers, including physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative

health care provider if any such alternative is reasonably available". <u>See</u> New York Public Health Law § 238-d.

39.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

40.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

41.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.      Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

42.     Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (<u>N.J.S.A.</u> 39:6B–1 to 3) and the Automobile Reparation Reform Act (<u>N.J.S.A.</u> 39:6A–1 <u>et</u> <u>seq</u>.), which require automobile insurers to provide PIP Benefits to Insureds.

43.     As in New York, under the New Jersey no-fault laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant

to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA–1500 form.

44.     In order for a healthcare services provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all significant laws and regulations governing healthcare practice.

45.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary or actually provided.

46.     In New Jersey, with limited exceptions that are not applicable here, ordinary, non–professional general business corporations are prohibited from engaging in the practice of medicine.

47.     General business corporations that unlawfully engage in the corporate practice of medicine violate are therefore not eligible to receive PIP Benefits in New Jersey.

48.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

49.     Similarly, pursuant to N.J.A.C. 13:44E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

50.     Therefore, physicians, chiropractors, medical practices, and chiropractic practices that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

51.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a healthcare practice in which they have a "significant beneficial interest".

52.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest … .

53.     Pursuant to N.J.S.A. 45:9–22.4:

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

54.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

55.     Pursuant to N.J.S.A. 45:9–22–5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals for certain procedures performed at an ambulatory care

facility, such as an ambulatory surgery center, so long as certain conditions are met (the "ASC Exception").

56.     In particular, at all relevant times, the Codey Law's restrictions did not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)     the practitioner who provided the referral personally performs the procedure;

(b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)     all clinically–related decisions at a facility owned in part by non–practitioners are made by practitioners and are in the best interests of the patient; and

(d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9–22.6).

57.     Thus, if a physician refers patients to a healthcare service she owns, or directs one of her employees to make such referrals, for procedures performed at an ambulatory surgical center, the referrals will not qualify for the ASC Exception and therefore will violate the Codey Law unless – among other things – the physician who makes the referral personally performs the resulting procedure.

58.     Physicians and entities in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

59.     Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

60.     Pursuant to N.J.S.A. 39:6A–2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)     is not primarily for the convenience of the injured person or provider;

(ii)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)   does not involve unnecessary diagnostic testing.

61.     Pursuant to the No-fault laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3–4.6.

62.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)     cervical spine strains, sprains, and contusions;

(ii)    cervical herniated disks or radiculopathies;

(iii)   thoracic spine strains, sprains, and contusions;

(iv)    thoracic herniated disks or radiculopathies;

(v)     lumbar–sacral spine strains, sprains, and contusions; and

(vi)    lumbar–sacral herniated disks or radiculopathies.

63.     The Care Paths generally provide for an initial, four–week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

64.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

65.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

66.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

67.     When a healthcare services provider submits a claim for PIP Benefits using the CPT codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

68.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A–1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

(i)      Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(ii)     Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(iii)     Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

<u>See</u> N.J.S.A. 17:33A–4.

69.     A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." <u>Id</u>.

70.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. <u>See</u> N.J.S.A 17:33A–7(a).

71.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. <u>See</u> N.J.S.A. 17:33A–7(b).

72.     The IFPA defines a pattern as five or more "related violations". <u>See</u> N.J.S.A. 17:33A–3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. <u>See</u> N.J.S.A.17:33A–3.

## II.     <u>The Defendants' Interrelated Fraudulent Schemes</u>

73.     Beginning no later than 2013, and continuing through the present day, the Defendants masterminded and implemented interrelated fraudulent schemes in which they billed GEICO millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

## A.     **Bethel Anesthesia's Unlawful Corporate Structure**

74.     On or about September 8, 2009, Cho caused Bethel Anesthesia to be incorporated in New Jersey as a general business corporation.

75.     Then, Cho unlawfully caused Bethel Anesthesia to engage in the corporate practice of medicine, as a general business corporation.

76.     Between at least 2013 and 2016, Cho and Bethel Anesthesia submitted hundreds of charges for Fraudulent Services billed through Bethel Anesthesia, and GEICO paid Cho and Bethel Anesthesia in reliance on those charges, despite the fact that – during this period – Bethel Anesthesia unlawfully was engaged in the corporate practice of medicine as a general, non-professional business corporation.

77.     All of the billing that Cho and Bethel Anesthesia submitted through Bethel Anesthesia to GEICO falsely represented that Bethel Anesthesia and the underlying Fraudulent Services were in compliance with relevant statutory and regulatory requirements governing healthcare practice, and were eligible to receive PIP reimbursement.

78.     In fact, neither Bethel Anesthesia nor the Fraudulent Services billed through Bethel Anesthesia to GEICO were in compliance with all relevant statutory and regulatory requirements governing healthcare practice, nor were they eligible to receive PIP reimbursement, because Bethel Anesthesia unlawfully was engaging in the corporate practice of medicine during this period as a general business corporation.

B.     **Bethel Anesthesia and Bethel Interventional's Unlawful Operations in New York**

79.     Bethel Anesthesia, Bethel Interventional, and Cho also falsely represented that they were entitled to collect PIP Benefits in connection with services that purportedly were provided in New York.

1.     **Bethel Anesthesia's Unlawful Operations in New York**

80.     Upon information and belief, Bethel Anesthesia – a New Jersey general business corporation – was not incorporated in New York and never obtained a certificate of authority from the New York Department of Education to operate as a medical practice in New York.

81.     For instance, the New York Department of State Division of Corporations website indicates that Bethel Anesthesia never was incorporated in New York or authorized to do business in New York.

82.     What is more, the New York Education Department's Office of the Professions website indicates that Bethel Anesthesia did not receive a certificate of authority from the New York Education Department.

83.     Even so, in the claims identified in Exhibit "2", in order to obtain a steady stream of patients, Cho unlawfully operated Bethel Anesthesia in New York from the office of Northern PT, located at 150-01 Northern Boulevard in Flushing, New York.

84.     For example:

(i)     Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on October 28, 2014, to an Insured named JK, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(ii)    Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on November 11, 2014, to an Insured named SW, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(iii)   Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on December 2, 2014, to an Insured named CL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(iv)    Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on January 6, 2015, to an Insured named JH, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(v)     Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on February 20, 2015, to an Insured named IL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(vi)    Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on March 17, 2015, to an Insured named HL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(vii)   Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on March 17, 2015, to an Insured named JL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(viii)  Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on May 8, 2015, to an Insured named PK, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(ix)    Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on June 9, 2015, to an Insured named JL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

(x)     Bethel Anesthesia and Cho billed GEICO for an examination that Cho purportedly provided on June 30, 2015, to an Insured named JC, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Anesthesia was not eligible to collect PIP Benefits in connection with the putative examination.

85.     These are only representative examples. In the claims identified in Exhibit "2", Bethel Anesthesia and Cho routinely billed GEICO through Bethel Anesthesia for patient examinations that were unlawfully performed in New York, to the extent that they were performed at all, despite the fact that Bethel Anesthesia was not authorized to operate as a medical practice in New York.

86.     Each such bill falsely represented that Bethel Anesthesia was eligible to receive PIP Benefits in connection with the purported services, when in fact it was not.

## 2.      Bethel Interventional' s Unlawful Operation in New York

87.     Upon information and belief, Bethel Interventional – a New Jersey medical professional limited liability company – was not organized in New York and never obtained a certificate of authority from the New York Department of Education to operate as a medical practice in New York.

88.     For instance, the New York Department of State Division of Corporations website indicates that Bethel Interventional never was organized in New York or authorized to do business in New York.

89.     What is more, the New York Education Department's Office of the Professions website indicates that Bethel Interventional did not receive a certificate of authority from the New York Education Department.

90.     Even so, in the claims identified in Exhibit "3", in order to obtain a steady stream of patients, Cho unlawfully operated Bethel Interventional in New York from Northern PT's office in Flushing, New York.

91.     For example:

(i)     Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on May 19, 2015, to an Insured named GK, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(ii)     Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on January 5, 2016, to an Insured named JK, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(iii)     Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on January 13, 2016, to an Insured named MM, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(iv)     Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on March 4, 2016, to an Insured named JO, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(v)      Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on October 14, 2016, to an Insured named SP, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(vi)     Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on August 2, 2017, to an Insured named JK, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(vii)    Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on November 21, 2017, to an Insured named TP, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(viii)   Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on January 29, 2018, to an Insured named JK, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(ix)     Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on May 2, 2018, to an Insured named JL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

(x)      Bethel Interventional and Cho billed GEICO for an examination that Cho purportedly provided on May 2, 2018, to an Insured named AL, at 150-01 Northern Boulevard, Flushing, New York, despite the fact that Bethel Interventional was not eligible to collect PIP Benefits in connection with the putative examination.

92.      These are only representative examples. In the claims identified in Exhibit "3", Bethel Interventional and Cho routinely billed GEICO through Bethel Interventional for patient examinations that were unlawfully performed in New York, to the extent that they were performed

at all, despite the fact that Bethel Interventional was not authorized to operate as a medical practice in New York.

93.     Each such bill falsely represented that Bethel Interventional was eligible to receive PIP Benefits in connection with the purported services, when in fact it was not.

## C.     The Defendants' Unlawful Referrals

94.     In order to bill GEICO and other automobile insurers for initial examinations, follow-up examinations, and pain management injections, Cho and Bethel Interventional needed to obtain patient referrals from other healthcare providers.

95.     At the same time, Mah, Choi, Song, and Northern PT wanted to submit as much billing as possible to GEICO and other automobile insurers for the Fraudulent Services, without regard for whether the Fraudulent Services were medically necessary.

96.     However, in many of the claims identified in Exhibits "1" and "3", contemporaneous police reports indicated that the underlying accidents involved low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or at all.

97.     What is more, in many of the claims identified in Exhibits "1" and "3", the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue diagnosis.

98.     To the extent that the Insureds in the claims set forth in Exhibits "1" and "3" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains.

99.     Ordinary soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment, or no treatment at all.

100.    As a result, Mah, Choi, Song, and Northern PT also knew that it would be much easier for them to obtain payment on large amounts of PIP insurance billing for medically unnecessary chiropractic, physical therapy and/or acupuncture services if a licensed physician or physicians were to: (i) generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains; and/or (ii) recommend the continued provision of chiropractic, physical therapy, and/or acupuncture treatment services.

101.    Accordingly, Mah, Choi, Song, and Northern PT entered into a secret agreement with Cho and Bethel Interventional, whereby Mah, Choi, Song, and Northern PT would refer Insureds to Cho and Bethel Interventional for expensive and medically unnecessary services, despite the Insureds' lack of any genuine presenting problems that would warrant the services in the first instance.

102.    In the claims identified in Exhibits "1" and "3", Northern PT, Mah, Choi, and Song routinely referred Insureds to Cho and Bethel Interventional for healthcare services – despite the lack of any legitimate, clinical justification to do so – in exchange for unlawful compensation from Cho and Bethel Interventional.

103.    The unlawful compensation was provided in the form of: (i) ostensibly legitimate fees to "lease" space or personnel at Northern PT's offices, actually were disguised kickbacks paid in exchange for patient referrals; and/or (ii) return referrals back from Cho and Bethel Interventional to Northern PT for the continued provision of medically unnecessary physical therapy, chiropractic, acupuncture, and related services.

104.    In reality, these were "pay–to–play" arrangements that caused Northern PT, Mah, Choi, and Song provide access to Insureds and to refer Insureds to Cho and Bethel Interventional for the Fraudulent Services without regard for medical necessity or the Insureds' individual circumstances or presentation.

105.    In keeping with the fact that these ostensibly legitimate "rent" payments actually were disguised kickbacks in exchange for patient referrals, Cho and Bethel Interventional operated from Northern PT's office on only a sporadic basis.

106.    For example, Bethel Interventional did not maintain regular office hours at Northern PT's office. Rather, Cho and Bethel Interventional typically appeared at Northern PT's office on different days each month, only when Northern PT office had patients to refer to Cho and Bethel Interventional pursuant to the unlawful referral scheme.

107.    In keeping with the fact that Cho and Bethel Interventional's return referrals to Northern PT were not predicated on medical necessity, and in fact constituted unlawful compensation to Mah, Choi, Song, and Northern PT for the initial referrals of the Insureds, Bethel Interventional, Cho, Northern PT, Mah, Choi, and Song's own records indicated that the prior chiropractic, physical therapy, and/or acupuncture treatment services the Insureds had received at Northern PT had not been effective in resolving the Insureds' supposed complaints.

108.    For example:

(i)     On August 26, 2015, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain at the scene. Later, on August 27, 2015, EA traveled on her own to North Shore-Long Island Jewish Emergency Department. The contemporaneous hospital records indicated that EA complained of neck pain. The hospital records further indicated that EA was briefly observed on an outpatient basis and then discharged with nothing more than a neck strain diagnosis. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on August 28, 2015, EA sought

treatment from Mah, Choi, Song, and Northern PT, where EA purportedly received chiropractic, physical therapy, and acupuncture services between August 2015 and January 2016. In August 2015, Mah, Choi, Song, and Northern PT caused EA to be referred to Bethel Interventional pursuant to the Defendants' referral arrangement, despite the fact that EA had only just begun a course of conservative treatment. Thereafter, on September 1, 2015, Cho and Bethel Interventional purported to examine EA and Cho referred EA to Northern PT for physical therapy services. What is more, on November 10, 2015, Cho and Bethel Interventional provided another examination to EA and falsely reported that EA continued to suffer from high levels of pain. Though the physical therapy services that Mah, Choi, Song, and Northern PT purportedly had provided supposedly had been ineffective in resolving EA's putative symptoms, Cho nonetheless caused EA to be referred back to Northern PT for continued physical therapy services at the conclusion of the November 10, 2015 examination. Later, Cho and Bethel Interventional provided another examination of EA on December 15, 2015, and again Cho referred EA back to Northern PT for continued physical therapy despite the fact that – by that point – EA had received over three months of physical therapy services that supposedly had been ineffective in resolving EA's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Northern PT to Bethel Interventional.

(ii)     On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, on September 22, 2015, NK sought treatment from Mah, Choi, Song, and Northern PT, where NK purportedly received chiropractic and physical therapy services between September 2015 and June 2016, and acupuncture services between December 2015 and June 2016. In September 2015, Mah, Choi, Song, and Northern PT caused NK to be referred to Bethel Interventional pursuant to the Defendants' referral arrangement, despite the fact that NK had only just begun a course of conservative treatment. Thereafter, on October 6, 2015, Cho and Bethel Interventional purported to examine NK and Cho referred NK to Northern PT for physical therapy services. What is more, on January 8, 2016, Cho and Bethel Interventional purported to examine NK again at Northern PT's office in Flushing, New York, and Cho referred NK back to Northern PT for continued physical therapy services. Then, on April 11, 2016, a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional provided another examination to NK and falsely reported that NK continued to suffer from high levels of pain. Though the physical therapy services that Mah, Choi, Song, and Northern PT purportedly had provided supposedly had been ineffective in resolving NK's putative symptoms, Cho nonetheless caused NK to be referred back to Northern PT for continued physical therapy services at the

conclusion of the April 11, 2016 examination. Later, Lee, Cho, and Bethel Interventional provided another examination of NK on May 23, 2016, at Northern PT's office in Flushing, New York, and again Cho caused NK to be referred back to Northern PT for continued physical therapy services despite the fact that – by that point – NK had received eight months of physical therapy services that supposedly had been ineffective in resolving NK's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Northern PT to Bethel Interventional.

(iii)    On December 12, 2015, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that EL complained neck and back pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, on March 29, 2016, EL sought treatment from Mah, Choi, Song, and Northern PT, where EL purportedly received chiropractic, physical therapy, and acupuncture services between March 2016 and March 2017, and Mah, Choi, Song, and Northern PT caused EL to be referred to Bethel Interventional pursuant to the Defendants' referral arrangement, despite the fact that EL had only just begun a course of conservative treatment. The same day, on March 29, 2016, Cho and Bethel Interventional purported to examine EL at Northern PT's office in Flushing, New York, and Cho referred EL to Northern PT for physical therapy services. Then, on May 31, 2016, Cho and Bethel Interventional purported to examine EL again at Northern PT's office in Flushing, New York, and Cho referred EL back to Northern PT for continued physical therapy services. What is more, Cho and Bethel Interventional purported to examine EL against at Northern PT's office in Flushing, New York, on July 5, 2016, and Cho referred EL back to Northern PT for continued physical therapy services. Then, on August 26, 2016, a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional purported to examine EL again at Northern PT's office in Flushing, New York, and Cho caused EL to be referred back to Northern PT for continued physical therapy services. Again, on October 17, 2016, Lee, Cho, and Bethel Interventional purported to examine EL again at Northern PT's office in Flushing, New York, and Cho caused EL to be referred back to Northern PT for continued physical therapy services. Then, on December 5, 2016, Lee, Cho, and Bethel Interventional purported to examine EL again at Northern PT's office in Flushing, New York, and Cho caused EL to be referred back to Northern PT for continued physical therapy services. Again, on January 2, 2017, Lee, Cho, and Bethel Interventional purported to examine EL again at Northern PT's office in Flushing, New York, and Cho caused EL to be referred back to Northern PT for continued physical therapy services, despite the fact that – by that point – EL had received about nine months of physical therapy services that supposedly had been ineffective in resolving EL's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Northern PT to Bethel Interventional.

(iv)     On August 11, 2016, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, on August 15, 2016, CY sought treatment from Mah, Choi, Song, and Northern PT, where CY purportedly received chiropractic, physical therapy, and acupuncture services between August 2016 and March 2017. In August 2016, Mah, Choi, Song, and Northern PT caused CY to be referred to Bethel Interventional pursuant to the Defendants' referral arrangement, despite the fact that CY had just begun a course of conservative treatment. Thereafter, on August 17, 2016, Cho and Bethel Interventional purported to examine CY at Northern PT's Flushing, New York office, and Cho referred CY to Northern PT for physical therapy services. Then, on September 19, 2016, a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional purported to examine CY again at Northern PT's office in Flushing, New York, and Cho caused CY to be referred back to Northern PT for continued physical therapy services. What is more, on November 14, 2016, Lee, Cho, and Bethel Interventional purported to examine CY against at Northern PT's office in Flushing, New York, and again Cho cause CY to be referred back to Northern PT for continued physical therapy services. Later, Lee, Cho, and Bethel Interventional purported to provide another examination to CY at Northern PT's office in Flushing, New York, on December 19, 2016, and again Cho caused CY to be referred back to Northern PT for continued physical therapy services, despite the fact that – by that point – CY had received four months of physical therapy services that supposedly had been ineffective in resolving CY's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Northern PT to Bethel Interventional.

(v)     On January 7, 2017, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured and did not complain of any pain at the scene. In keeping with the fact that SS was not seriously injured, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, on January 9, 2017, SS sought treatment from Mah, Choi, Song, and Northern PT, where SS purportedly received chiropractic and physical therapy services between January 2017 and June 2017, and Mah, Choi, Song, and Northern PT caused SS to be referred to Bethel Interventional pursuant to the Defendants' referral arrangement, despite the fact that SS had only just begun a course of conservative treatment. The same day, on January 9, 2017, a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional purported to

examine SS at Northern PT's office in Flushing, New York, and Cho caused SS to be referred to Northern PT for physical therapy services. Then, on February 27, 2017, Lee, Cho, and Bethel Interventional purported to examine SS again at Northern PT's office in Flushing, New York, and Cho caused SS to be referred back to Northern PT for continued physical therapy. What is more, on April 10, 2017, Lee, Cho, and Bethel Interventional purported to examine SS at Northern PT's office in Flushing, New York and falsely reported that SS continued to suffer from pain. Though the physical therapy services that Mah, Choi, Song, and Northern PT purportedly had provided supposedly had been in effective in resolving SS's putative symptoms, Cho nonetheless caused SS to be referred back to Northern PT for continued physical therapy at the conclusion of the April 10, 2017 examination. Later, Lee, Cho, and Bethel Interventional purported to provide another examination to SS at Northern PT's office in Flushing, New York, on May 22, 2017, and again Cho caused SS to be referred back to Northern PT for continued physical therapy services, despite the fact that – by that point – SS had received over four months of physical therapy services that supposedly had been ineffective in resolving SS's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Northern PT to Bethel Interventional.

109. These are only representative examples. In the claims identified in Exhibits "1" and "3", Mah, Choi, Song, and Northern PT routinely referred Insureds to Cho and Bethel Interventional, or caused them to be referred, in exchange for unlawful compensation from Cho and Bethel Interventional.

110. In a legitimate clinical setting, it is improbable – to the point of impossibility – that a large cohort of patients being treated by a single chiropractic practice after being involved in relatively minor accidents legitimately would require referrals to a medical pain management practice.

111. Even so, in exchange for unlawful compensation from Cho and Bethel Interventional, Mah, Choi, Song, and Northern PT referred almost half of their GEICO-insured patients to Bethel Interventional, despite the lack of any legitimate clinical justification to do so.

112. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

113.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

114.     As set forth above, in the claims identified in Exhibits "1" and "3", many of the Insureds whom Bethel Interventional, Cho, Northern PT, Mah, Choi, and Song purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

115.     It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1"and "3" would suffer from injuries that would resolve, or fail to resolve, at such an identical rate that they would both require referrals to Cho and Bethel Interventional on or about the same date after their accidents.

116.     It is even more improbable – to the point of impossibility – that this would occur repeatedly.

117.     Even so – and in keeping with the fact that Mah, Choi, Song, and Northern PT's referrals to Cho and Bethel Interventional were based upon unlawful compensation, rather than medical necessity – this repeatedly occurred at Northern PT.

118.     For example:

(i)     On August 26, 2015, two Insureds – EA and GA – were involved in an automobile accident. EA and GA were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that EA and GA suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. EA and GA did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel Interventional, in August 2015, Mah, Choi, Song, and Northern PT referred both EA and GA to Cho and Bethel International, and thereafter, EA and GA both presented – only six days after the accident – on September 1, 2015, for initial examinations by Cho and Bethel Interventional, despite the fact that they were differently situated, had only just

begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(ii)   On March 21, 2016, two Insureds – EC and NP – were involved in an automobile accident. EC and NP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that EC and NP suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. EC and NP did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both EC and NP to Cho and Bethel International in March 2015, and thereafter, EC and NP both presented – only four days after the accident – on March 25, 2016, for initial examinations by a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(iii)  On November 15, 2016, two Insureds – JK and BK – were involved in an automobile accident. JK and BK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that JK and BK suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. JK and BK did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both JK and BK to Cho and Bethel International in November 2016, and thereafter, JK and BK both presented – only six days after the accident – on November 21, 2016, for initial examinations by a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(iv)   On January 7, 2017, two Insureds – SS and TS – were involved in an automobile accident. SS and TS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that SS and TS suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. SS and TS did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both SS and TS to Cho and Bethel International in January 2017, and thereafter, SS presented – only two days after the accident – on January 9, 2017, for an initial examination by a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional, and TS presented – only sixteen days after the accident

– on January 23, 2017, for an initial examination by Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(v)    On April 29, 2017, two Insureds – KS and KK – were involved in an automobile accident. KS and KK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that KS and KK suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. KS and KK did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both KS and KK to Cho and Bethel International in May 2017, and thereafter, KK presented – only nine days after the accident – on May 8, 2017, for an initial examination by a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional, and KS presented – only sixteen days after the accident – on May 15, 2017, for an initial examination by Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(vi)   On May 14, 2017, two Insureds – JT and MS – were involved in an automobile accident. JT and MS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that JT and MS suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. JT and MS did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both JT and MS to Cho and Bethel International in May 2017, and thereafter, JT and MS both presented – only three weeks after the accident – on June 5, 2017, for initial examinations by a nurse practitioner named Eunmyung Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(vii)  On May 30, 2017, two Insureds – SP and SK – were involved in an automobile accident. SP and SK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that SP and SK suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. SP and SK did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both SP and SK to Cho and Bethel International in May 2017,

and thereafter, SP and SK both presented – only six days after the accident – on June 5, 2017, for initial examinations by a nurse practitioner named Eunmyung Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(viii)   On September 19, 2017, two Insureds – EP and PP – were involved in the same automobile accident. EP and PP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that EP and PP suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. EP and PP did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both EP and PP to Cho and Bethel International on September 19, 2017, and then, the same day, on September 19, 2017 – also the same day as the accident – EP and PP both presented for initial examinations by Cho and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(ix)   On November 2, 2017, two Insureds – JL and JC – were involved in an automobile accident. JL and JC were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that JL and JC suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. JL and JC did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both JL and JC to Cho and Bethel International in November 2017, and thereafter, JL and JC both presented – only four days after the accident – on November 6, 2017, for initial examinations by a nurse practitioner named Eunmyung Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

(x)   On February 26, 2018, two Insureds – ML and JL – were involved in an automobile accident. ML and JL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different injuries in the accident, to the extent that they suffered any injuries at all. What is more, to the extent that ML and JL suffered any injuries in the accident, their injuries resolved or failed to resolve at different rates. ML and JL did not both require referrals to Cho and Bethel Interventional. Even so, in exchange for unlawful compensation from Cho and Bethel International, Mah, Choi, Song, and Northern PT referred both ML and JL to Cho and Bethel International in March 2018, and thereafter, ML and JL both presented – only seven days after the accident

– on March 5, 2018, for initial examinations by a nurse practitioner named Eunmyung Lee, Cho, and Bethel Interventional, despite the fact that they were differently situated, had only just begun a course of conservative treatment, and did not require any services from Bethel Interventional in the first place.

119. In the claims identified in Exhibits "1" and "3", Bethel Interventional, Cho, Northern PT, Mah, Choi, and Song falsely represented that they were in compliance with all relevant laws governing healthcare practice, and therefore were eligible to collect PIP Benefits in the first instance.

120. In fact, Bethel Inrterventional, Cho, Northern PT, Mah, Choi, and Song were not in compliance with all relevant laws and regulations governing healthcare practice, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they paid and received unlawful compensation in exchange for patient referrals.

**D.     The Defendants' Fraudulent Treatment and Billing Protocol**

**1.     The Fraudulent Charges for Initial Examinations at Northern PT**

121. In the claims identified in Exhibit "1", Northern PT, Mah, Choi, and Song purported to provide virtually every Insured with an initial examination.

122. As set forth in Exhibit "1", Mah purported to perform virtually all the putative initial examinations at Northern PT, which were typically billed to GEICO under CPT code 99203, typically resulting in a charge of $54.74 for each purported initial examination.

123. In fact, Northern PT never was eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither Northern PT nor the examinations were in compliance with all significant laws and regulations governing healthcare practice.

124. The charges for the initial examinations were fraudulent in that they misrepresented Northern PT's eligibility to collect PIP Benefits in the first instance.

125. Moreover, and as set forth below, the charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

126. In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Northern PT, Mah, Choi, and Song routinely misrepresented the severity of the Insureds' presenting problems.

127. At all relevant times, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically required that the Insured present with problems of moderate severity.

128. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

129. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

130. Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

131. By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

132. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

133. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

134. Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

135. Even so, in the claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

136.    For example:

(i)    On August 26, 2015, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain at the scene. Later, on August 27, 2015, EA traveled on her own to North Shore-Long Island Jewish Emergency Department. The contemporaneous hospital records indicated that EA complained of neck pain. The hospital records further indicated that EA was briefly observed on an outpatient basis and then discharged with nothing more than a neck strain diagnosis. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EA by Mah on August 28, 2015, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)    On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NK by on September 22, 2015, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On December 12, 2015, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that EL complained of neck and back pain at the scene. However, and in keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EL by Mah on March 29, 2016, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On August 7, 2016, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any

pain at the scene. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NC by Mah on August 31, 2016, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)     On August 11, 2016, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of CY by Mah on August 15, 2016, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)    On January 7, 2017, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured and did not complain of any pain at the scene. In keeping with the fact that SS was not seriously injured, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SS by Mah on January 9, 2017, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)   On April 29, 2017, an Insured named KK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that KK's vehicle was drivable following the accident. The police report further indicated that KK was not injured and did not complain of any pain at the scene. In keeping with the fact that KK was not seriously injured, KK did not visit any hospital emergency room following the accident. To the extent that KK experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KK by Mah on May 4, 2017, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)  On May 30, 2017, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact,

rear-end collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SK by Mah on May 31, 2016, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)     On September 19, 2017, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that PP's vehicle was drivable following the accident. In keeping with the fact that PP was not seriously injured, PP did not visit any hospital emergency room following the accident. To the extent that PP experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of PP on September 19, 2017, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)      On November 26, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that YG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JP by Mah on December 2, 2017, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

137.     These are only representative examples. In many of the claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

138.     In the claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the putative examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

139.     In the claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations**

140.     What is more, in the claims identified in Exhibit "1" for initial examinations under CPT code 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor or other healthcare provider – virtually always Mah – spent with the Insureds or the Insureds' families.

141.     Pursuant to the Fee Schedule, the use of CPT 99203 to bill for an initial examination represents that chiropractor or other healthcare provider who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

142.     As set forth in Exhibit "1", Mah, Choi, Song, and Northern PT submitted many of their bills for initial examinations under CPT code 99203, and thereby represented that the chiropractor or healthcare provider who purported to perform the initial examinations spent 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

143.     In fact, in the claims for initial examinations identified in Exhibit "1", neither Mah, nor any other healthcare provider associated with Northern PT ever spent 30 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

144.     Rather, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not entail more than 15 or 20 minutes of face-to-face time between the examining chiropractor or other healthcare provider and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

145.     For instance, and in keeping with the fact that the initial examinations allegedly provided through Northern PT did not entail more than 15 or 20 minutes of face-to-face time with the Insureds or their families, Northern PT, Mah, Choi, and Song used a template in purporting to provide the initial examinations.

146.     The template that Mah used to document the putative examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, diagnoses, and treatment recommendations.

147.     All that was required to complete the template was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other basic forms of chiropractic testing.

148.     These interviews and examinations did not require any chiropractor or other healthcare provider associated with Northern PT to spend more than 15 or 20 minutes of face-to-face time with the Insureds or their families during the putative initial examinations.

149.     In the claims for initial examinations identified in Exhibit "1", Mah, Choi, Song, and Northern PT falsely represented that the examinations involved 30 minutes of face-to-face

time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

**c.    Misrepresentations Regarding "Detailed" Physical Examinations**

150.    Moreover, in the claims identified in Exhibit "1" for initial examinations under CPT code 99203, Northern PT, Mah, Choi, and Song falsely represented the extent of the underlying physical examinations.

151.    Pursuant to the Fee Schedule, at all relevant times the use of CPT code 99203 to bill for a patient examination represented that the chiropractor who performed the examination conducted a "detailed" physical examination.

152.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

153.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to musculoskeletal complaints.

154.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

155.     In the claims for initial examinations identified in Exhibit "1", when Northern PT, Mah, Choi, and Song billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractor or other healthcare provider associated with Northern PT who purported to perform the examinations performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

156.     In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", neither Mah, nor any other healthcare provider associated with Northern PT, ever conducted an extended examination of the Insureds' musculoskeletal systems.

157.     For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", neither Mah nor any other healthcare provider associated with Northern PT ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii) examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin and/or other location;

(v) brief assessment of mental status;

(vi) examination of gait and station;

(vii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix) examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x) examination of sensation.

158. For example:

(i) On or about August 28, 2015, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named EA, and thereby represented that they had provided a "detailed" physical examination to EA. However, Mah did not document an extended examination of EA's musculoskeletal system, despite the fact that – to the extent EA had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii) On or about September 22, 2015, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named NK, and thereby represented that they had provided a "detailed" physical examination to NK. However, Mah did not document an extended examination of NK's musculoskeletal system, despite the fact that – to the extent NK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)     On or about March 29, 2016, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named EL, and thereby represented that they had provided a "detailed" physical examination to EL. However, Mah did not document an extended examination of EL's musculoskeletal system, despite the fact that – to the extent EL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On or about August 15, 2016, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named CY, and thereby represented that they had provided a "detailed" physical examination to CY. However, Mah did not document an extended examination of CY's musculoskeletal system, despite the fact that – to the extent CY had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On or about August 31, 2016, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named NC, and thereby represented that they had provided a "detailed" physical examination to NC. However, Mah did not document an extended examination of NC's musculoskeletal system, despite the fact that – to the extent NC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)     On or about May 8, 2017, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named HH, and thereby represented that they had provided a "detailed" physical examination to HH. However, Mah did not document an extended examination of HH's musculoskeletal system, despite the fact that – to the extent HH had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)     On or about May 4, 2017, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named KK, and thereby represented that they had provided a "detailed" physical examination to KK. However, Mah did not document an extended examination of KK's musculoskeletal system, despite the fact that – to the extent KK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)     On or about January 9, 2017, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named SS, and thereby represented that they had provided a "detailed" physical examination to SS. However, Mah did not document an extended examination of SS's musculoskeletal system, despite the fact that – to the extent SS had any complaints at all as the result of the automobile accident – they were limited

to musculoskeletal complaints.

(ix)    On or about September 19, 2017, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named PP, and thereby represented that they had provided a "detailed" physical examination to PP. However, Mah did not document an extended examination of PP's musculoskeletal system, despite the fact that – to the extent PP had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)    On or about March 1, 2018, Mah, Choi, Song, and Northern PT billed GEICO under CPT code 99203 for an initial examination that Mah purported to perform on an Insured named JL, and thereby represented that they had provided a "detailed" physical examination to JL. However, Mah did not document an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

159.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song falsely represented that they had provided "detailed" physical examinations, and that their putative examinations therefore were billable under CPT code 99203, because examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require "detailed" patient examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

160.    Furthermore, pursuant to the Fee Schedule, at all relevant times the use of CPT code 99203 to bill for a patient examination represented that the chiropractor who performed the examination engaged in "low complexity" medical decision-making.

161.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant

complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

162.    Similarly, pursuant to the CPT Assistant, the presenting problems that could require low complexity medical decision-making, and therefore support the use of CPT code 99203 to bill for an initial examination, typically are chronic and relatively serious problems.

163.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1", had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains, to the extent that they had any legitimate presenting problems at all.

164.    The diagnosis and treatment of these minor sprains, strains, and similar soft tissue injuries did not require any legitimate, low-complexity medical decision-making.

165.    First, in most of the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

166.    When the Insureds in the claims identified in Exhibit "1", presented to Northern PT for "treatment", they typically did not arrive with any medical records except, at times, basic radiology reports.

167.    Furthermore, prior to the initial examinations, Northern PT, Mah, Choi, and Song typically neither requested any medical records from any other providers, nor conducted any diagnostic tests.

168.    Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complication or morbidity – much less mortality – from the Insureds'

relatively minor soft–tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

169.     Nor, by extension, was there any risk of significant complication, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

170.     In almost every instance, any "treatments" that the Defendants actually provided were limited to chiropractic treatment, physical therapy treatment, acupuncture treatment, electrodiagnostic testing, and pain management injections, none of which was health– or life–threatening if properly administered.

171.     Third, in the vast majority of claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

172.     Rather, to the extent that the initial examinations were conducted in the first instance, Northern PT, Mah, Choi, and Song provided objectively unverifiable soft tissue injury "diagnoses" for most Insureds, and prescribed a substantially similar course of treatment for the Insureds, regardless of the individual circumstances regarding the Insured's purported injuries and/or complaints of pain.

173.     Specifically, in the vast majority of claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

174.     Even so, Northern PT, Mah, Choi, and Song prepared initial examination reports in which they provided a phony series of objectively unverifiable soft–tissue injury "diagnoses" to virtually every Insured.

175.     Then, based upon these phony "diagnoses", Northern PT, Mah, Choi, and Song directed Insureds to receive: (i) medically unnecessary chiropractic and/or acupuncture services; (ii) computerized range of motion and muscle testing; (iii) diagnostic imaging services; (iv) durable medical equipment; and/or (v) electrodiagnostic testing, regardless of the individual circumstances.

176.     For example:

(i)     On August 26, 2015, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain at the scene. Later, on August 27, 2015, EA traveled on her own to North Shore-Long Island Jewish Emergency Department. The contemporaneous hospital records indicated that EA complained of neck pain. The hospital records further indicated that EA was briefly observed on an outpatient basis and then discharged with nothing more than a neck strain diagnosis. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. On August 28, 2015, Mah purported to conduct an initial examination of EA at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided EA with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EA's presenting problems, nor the treatment plan provided to EA by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, EA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, a cervical collar, and a referral for medical evaluation, which did not pose the least bit of risk to EA. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 22, 2015, Mah purported to conduct an initial examination of NK at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided NK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NK's presenting problems, nor the treatment plan provided to NK by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, NK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, and a referral for medical evaluation, which did not pose the least bit of risk to NK. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On December 12, 2015, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that EL complained neck and back pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 29, 2016, Mah purported to conduct an initial examination of EL at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided EL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EL's presenting problems, nor the treatment plan provided to EL by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, EL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, electrodiagnostic testing, and a referral for medical evaluation,

which did not pose the least bit of risk to EL. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On August 7, 2016, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 31, 2016, Mah purported to conduct an initial examination of NC at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided NC with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NC's presenting problems, nor the treatment plan provided to NC by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, NC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, electrodiagnostic testing, a cervical collar, and a referral for medical evaluation, which did not pose the least bit of risk to NC. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)    On August 11, 2016, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 15, 2016, Mah purported to conduct an initial examination of CY at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided CY with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CY's presenting problems, nor the treatment plan

provided to CY by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, CY did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, and a referral for medical evaluation, which did not pose the least bit of risk to CY. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On January 7, 2017, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured and did not complain of any pain at the scene. In keeping with the fact that SS was not seriously injured, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as the result of the accident, they were of low or minimal severity. On January 9, 2017, Mah purported to conduct an initial examination of SS at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided SS with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SS's presenting problems, nor the treatment plan provided to SS by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, SS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic services, range of motion/muscle testing, diagnostic imaging services, and a referral for medical evaluation, which did not pose the least bit of risk to SS. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)     On April 29, 2017, an Insured named KK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that KK's vehicle was drivable following the accident. The police report further indicated that KK was not injured and did not complain of any pain at the scene. In keeping with the fact that KK was not seriously injured, KK did not visit any hospital emergency room following the accident. To the extent that KK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 4, 2017, Mah purported to conduct an initial examination of KK at Northern PT. Mah did not retrieve, review, or analyze any

significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided KK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KK's presenting problems, nor the treatment plan provided to KK by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, KK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, durable medical equipment, and a referral for medical evaluation, which did not pose the least bit of risk to KK. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On May 30, 2017, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 31, 2016, Mah purported to conduct an initial examination of SK at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided SK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SK's presenting problems, nor the treatment plan provided to SK by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, SK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, durable medical equipment, and a referral for medical evaluation, which did not pose the least bit of risk to SK. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On September 19, 2017, an Insured named PP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision, and that PP's vehicle was drivable following the accident. In

keeping with the fact that PP was not seriously injured, PP did not visit any hospital emergency room following the accident. To the extent that PP experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 19, 2017, Mah purported to conduct an initial examination of PP at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided PP with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PP's presenting problems, nor the treatment plan provided to PP by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, PP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle strength testing, diagnostic imaging services, durable medical equipment, and a referral for medical evaluation, which did not pose the least bit of risk to PP. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)     On November 26, 2017, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as the result of the accident, they were of low or minimal severity. On December 2, 2017, Mah purported to conduct an initial examination of JP at Northern PT. Mah did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Mah did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mah provided JP with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JP's presenting problems, nor the treatment plan provided to JP by Mah, Choi, Song, and Northern PT, presented any risk of significant complications, morbidity, or mortality. To the contrary, JP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Mah, Choi, Song, and Northern PT consisted of medically unnecessary chiropractic and acupuncture services, range of motion/muscle testing, diagnostic imaging services, and a referral for medical evaluation, which did not pose the least bit of risk to JP. Even so, Mah, Choi, Song, and Northern PT billed GEICO for the initial examination using CPT code 99203, and thereby falsely

represented that Mah engaged in some legitimate, low complexity medical decision-making during the purported examination.

177.     It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

178.     It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations at Northern PT with substantially identical injuries on or about the exact same dates after their accidents.

179.     Even so, in keeping with the fact that Northern PT, Mah, Choi, and Song's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Northern PT, Mah, Choi, and Song frequently issued substantially similar, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and/or recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that they did not require it.

180.     For example:

(i)     On December 22, 2015, two Insureds – YK and SY – were involved in the same automobile accident. Thereafter, YK and SY both presented – incredibly, on the exact same date, December 28, 2015 – to Northern PT for purported initial examinations by Mah. YK and SY were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided YK and SY with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ii)     On October 17, 2016, two Insureds – KK and DS – were involved in the same automobile accident. Thereafter, KK and DS both presented – incredibly, on the exact same date, October 17, 2016 – to Northern PT for purported initial examinations by Mah. KK and DS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and

suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided KK and DS with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(iii)    On May 13, 2017, two Insureds – JG and AV – were involved in the same automobile accident. Thereafter, JG and AV both presented – incredibly, on the exact same date, May 17, 2017 – to Northern PT for purported initial examinations by Mah. JG and AV were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided JG and AV with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(iv)    On May 30, 2017, two Insureds – SP and SK – were involved in the same automobile accident. Thereafter, SP and SK both presented – incredibly, on the exact same date, May 31, 2017 – to Northern PT for purported initial examinations by Mah. SP and SK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided SP and SK with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(v)    On September 30, 2017, two Insureds – JC and VO – were involved in the same automobile accident. Thereafter, JC and VO both presented – incredibly, on the exact same date, October 6, 2017 – to Northern PT for purported initial examinations by Mah. JC and VO were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided JC and VO with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(vi)    On November 22, 2017, two Insureds – YK and HL – were involved in the same automobile accident. Thereafter, YK and HL both presented – incredibly, on the exact same date, November 30, 2017 – to Northern PT for purported initial examinations by Mah. YK and HL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided YK and HL with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(vii)    On November 26, 2017 – two Insureds – MS and JP – were involved in the same automobile accident. Thereafter, MS presented on December 1, 2017 to Northern PT for a purported initial examination by Mah. Then, JP presented the next day – on December 2, 2017 to Northern PT for a purported initial examination by Mah. MS and JP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided MS and JP with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(viii)   On February 26, 2018, two Insureds – JL and ML – were involved in the same automobile accident. Thereafter, JL and ML both presented – incredibly, on the exact same date, March 1, 2018 – to Northern PT for purported initial examinations by Mah. JL and ML were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided JL and ML with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ix)     On August 6, 2018, two Insureds – SK and SK – were involved in the same automobile accident. Thereafter, SK and SK both presented – incredibly, on the exact same date, August 20, 2018 – to Northern PT for purported initial examinations by Mah. SK and SK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided SK and SK with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(x)      On February 18, 2019, two Insureds – HY and HY – were involved in the same automobile accident. Thereafter, HY and HY both presented – incredibly, on the exact same date, February 19, 2019 – to Northern PT for purported initial examinations by Mah. HY and HY were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Mah provided HY and HY with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

181.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Northern PT, Mah, Choi, and Song frequently issued substantially similar "diagnoses", on or about the same date, to more than one Insured involved in a single

accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and in any case did not require the treatment.

182.	Northern PT, Mah, Choi, and Song routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

183.	In the claims for initial examinations identified in Exhibit "1", Northern PT, Mah, Choi, and Song routinely falsely represented that the putative examinations involved medical decision making of "low complexity" in order to provide a false basis to bill for the initial examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

**2.	The Fraudulent Charges for Computerized Range of Motion and Muscle Strength Tests at Northern PT**

184.	In an attempt to maximize the fraudulent billing that they could submit or caused to be submitted to GEICO, Northern PT, Mah, Choi, and Song also instructed many Insureds to return for medically useless computerized range of motion and muscle strength tests.

185.	As set forth in Exhibit "1", Northern PT, Mah, Choi, and Song purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the muscle strength tests to GEICO under CPT code 95831, typically resulting in over $200.00 in charges for each Insured who supposedly received the tests.

186.	The charges for the range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and

were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

a.    **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

187.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

188.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

189.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

190.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

191.    Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

192.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's examination, range of motion and muscle strength tests are to be reimbursed as an element of the examination.

193.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

**b.     The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

194.    To the extent that Northern PT, Mah, Choi, and Song actually provided patent examinations in the first instance, Northern PT, Mah, Choi, and Song purported to conduct manual range of motion tests on Insureds during the examinations.

195.    The charges for the range of motion tests were part and parcel of the charges that were submitted through Northern PT for purported initial examinations under CPT code 99203 and/or for purported follow-up examinations under CPT code 99212.

196.    Despite the fact that virtually every Insured already purportedly had undergone manual range of motion testing during their initial examination and/or follow-up examinations, Northern PT, Mah, Choi, and Song billed for, and purported to provide, computerized range of motion tests to many Insureds in the claims identified in Exhibit "1".

197.    Though the Insureds routinely visited Northern PT for follow-up examinations and other Fraudulent Services, Northern PT, Mah, Choi, and Song often deliberately scheduled separate appointments for computerized range of motion tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the NY Fee Schedule and NJ Fee Schedule.

198.    Northern PT, Mah, Choi, and Song purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that purportedly was performed during patient examinations, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

199.    The information gained through the use of the computerized range of motion tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually most Insured's patient examinations.

200.    In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading was meaningless.

201.    While computerized range of motion tests can be a medically useful tools as part of a research project, under the circumstances employed by Northern PT, Mah, Choi, and Song they unnecessarily duplicated the manual range of motion testing purportedly conducted during most Insureds' patient examinations.

202.    The computerized range of motion tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**c.      The Fraudulent Unbundling of Charges for the Range of Motion and Muscle Tests**

203.    Not only did Northern PT, Mah, Choi, and Song deliberately purport to provide duplicative, medically unnecessary computerized range of motion tests; they also unbundled their billing for range of motion and muscle strength testing, which maximized the fraudulent charges that they could submit to GEICO.

204.    Pursuant to the CPT Assistant, when range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

205.    CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes", identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

206.    CPT code 97750 is a "time-based" code that in the New York metropolitan area allows for a single charge of $45.71 for every 15 minutes of testing. Thus, if a provider performed 15 minutes of computerized range of motion and muscle strength testing, it would be permitted a single charge of $45.71 under CPT code 97750 in New York. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71 under CPT code 97750 in New York, resulting in total charges of $91.42, and so forth.

207. Northern PT, Mah, Choi, and Song routinely purported to provide range of motion and muscle strength tests to Insureds on the same dates of service.

208. The range of motion and muscle strength tests – together – did not take more than 15 minutes to perform. Thus, even if the range of motion and muscle strength tests that the Defendants purported to perform were medically necessary and actually performed, Northern PT would be limited to a single, time-based charge of $45.71 under CPT code 97750 in New York, for each date of service on which they performed range of motion and muscle strength tests on an Insured.

209. Nonetheless, to maximize their fraudulent billing for the range of motion and muscle strength tests, Northern PT, Mah, Choi, and Song routinely unbundled what should have been a single charge of $45.71 under CPT code 97750 for both range of motion and muscle testing into multiple charges: (i) typically between $59.65 and $174.40 under CPT code 95831 (for the muscle strength tests); and (ii) typically between $93.81 and $228.55 under CPT code 95851 (for the range of motion tests).

210. By unbundling what should be a single $45.71 under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, Northern PT, Mah, Choi, and Song substantially increased the already-fraudulent charges for the computerized range of motion and muscle strength testing that they submitted, or caused to be submitted, to GEICO.

**3. The Fraudulent Charges for Electrodiagnostic Testing at Northern PT**

211. Pursuant to the Defendants' phony "diagnoses" issued at the conclusion of the Defendants' patient examinations, Northern PT, Mah, Choi, Song, and Felderstein purported to subject many Insureds in the claims identified in Exhibit "1" to electrodiagnostic testing ("EDX"), including EMG and NCV tests.

212.     Mah and Felderstein purported to perform and/or provide the vast majority of the EDX tests that were billed through Northern PT to GEICO.

213.     As set forth in Exhibit "1", Northern PT, Mah, Choi, Song, and Felderstein typically billed the EDX tests to GEICO under CPT codes 95861, 95864, 95900, 95903, 95934, and 95936, generally resulting in billing of at least $2,000.00 for each Insured to whom the EDX testing purportedly was provided.

214.     In the claims for EDX tests identified in Exhibit "1", the charges for the EDX tests were fraudulent in that they misrepresented Northern PT's eligibility to collect PIP Benefits in the first instance.

215.     In fact, Northern PT never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as the result of the fraudulent and unlawful scheme described herein – neither Northern PT nor the EDX tests was in compliance with the relevant laws and regulations governing healthcare practice.

216.     What is more, the Defendants' charges for the EDX tests also were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment protocol instituted by the Defendants, not to benefit the Insureds who were purportedly subjected to them.

a.     **The Human Nervous System and Electrodiagnostic Testing**

217.     The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from

the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

218.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.

219.    A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

220.    EMG tests and NCV tests both are forms of electrodiagnostic tests, and purportedly were provided by Northern PT because they were medically necessary to determine whether the Insureds had radiculopathies.

221.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

222.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**b.    The Fraudulent NCV Tests**

223.    NCV tests are non–invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

224.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well–defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

225.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

226.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

227.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

228.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Northern PT, Mah, Choi, Song, and Felderstein routinely purported to perform and/or provide medically unnecessary: (i) NCV tests of at least eight motor nerves; (ii) NCV tests of at least 10 sensory nerves; and (iii) at least two H-reflex studies.

229.    For example:

(i)     On March 30, 2016, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named EL, supposedly to determine whether EL suffered from radiculopathy.

(ii)    On April 13, 2016, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named JY, supposedly to determine whether JY suffered from radiculopathy.

(iii)   On December 2, 2016, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named CY, supposedly to determine whether CY suffered from radiculopathy.

(iv)    On May 10, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named JN, supposedly to determine whether JN suffered from radiculopathy.

(v)     On June 7, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named HH, supposedly to determine whether HH suffered from radiculopathy.

(vi)    On June 7, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named KS, supposedly to determine whether KS suffered from radiculopathy.

(vii)   On August 16, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named SP, supposedly to determine whether SP suffered from radiculopathy.

(viii)  On January 31, 2018, Northern PT, Mah, Choi, Song, and Felderstein purported to

provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named JP, supposedly to determine whether JP suffered from radiculopathy.

(ix)     On January 31, 2018, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named MS, supposedly to determine whether MS suffered from radiculopathy.

(x)      On May 14, 2018, Northern PT, Mah, Choi, Song, and Felderstein purported to provide 10 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, four H-reflex studies to an Insured named ML, supposedly to determine whether ML suffered from radiculopathy.

230.     There are only representative examples. In the claims for NCV tests identified in Exhibit "1", Northern PT, Mah, Choi, Song, and Felderstein routinely purported to perform and/or provide a grossly–excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

231.     Northern PT, Mah, Choi, Song, and Felderstein routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies or any other conditions.

232.     What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

233.     In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real–time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

234.     As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient–to–patient.

235.     This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

236.     This concept also is emphasized in the CPT Assistant, which states that "Pre–set protocols automatically testing a large number of nerves are not appropriate."

237.     Even so, Northern PT, Mah, Choi, Song, and Felderstein did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

238.     Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in most of the NCV claims identified in Exhibit "1".

239.     In particular, Northern PT, Mah, Choi, Song, and Felderstein purported to test some combination of the following peripheral nerves and nerve fibers – and in many cases, all of them – in most of the NCV test claims identified in Exhibit "1":

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right radial motor nerves;

(iv)     left and right tibial motor nerves;

(v)      left and right ulnar motor nerves;

(vi)     left and right median sensory nerves;

(vii)    left and right radial sensory nerves;

(viii)    left and right superficial peroneal sensory nerves;

(ix)    left and right sural sensory nerves; and

(x)    left and right ulnar sensory nerves.

240.    Northern PT, Mah, Choi, Song, and Felderstein purported to test these identical peripheral nerves and nerve fibers in many of the NCV claims identified in Exhibit "1", despite the fact that the Insureds were differently situated, because their objective was to charge for as many NCV tests as possible, and not to treat or otherwise benefit the Insureds.

241.    The cookie–cutter approach to the NCVs that Northern PT, Mah, Choi, Song, and Felderstein purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie–cutter approach to the NCVs was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize ill–gotten profits for the Defendants.

**c.    The Fraudulent EMG Tests**

242.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well–defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

243.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real–time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number

of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient–to–patient.

244.     Northern PT, Mah, Choi, Song, and Felderstein did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they often tested the same muscles in the same limbs, without regard for individual patient presentation.

245.     Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that Northern PT, Mah, Choi, Song, and Felderstein purported to provide and/or perform often grossly exceeded the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

246.     According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

247.     Even so, in the substantial majority of the claims for EMGs identified in Exhibit "1", Northern PT, Mah, Choi, Song, and Felderstein purported to provide and/or perform medically unnecessary EMGs on four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit to GEICO.

248.     For example:

(i)      On March 30, 2016, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named EL, supposedly to determine whether EL suffered from radiculopathy.

(ii)     On April 13, 2016, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named JY, supposedly to determine whether JY suffered from radiculopathy.

(iii)    On December 2, 2016, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named CY, supposedly to determine whether CY suffered from radiculopathy.

(iv)     On May 10, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named JN, supposedly to determine whether JN suffered from radiculopathy.

(v)      On June 7, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named HH, supposedly to determine whether HH suffered from radiculopathy.

(vi)     On June 7, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named KS, supposedly to determine whether KS suffered from radiculopathy.

(vii)    On August 16, 2017, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named SP, supposedly to determine whether SP suffered from radiculopathy.

(viii)   On January 31, 2018, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named JP, supposedly to determine whether JP suffered from radiculopathy.

(ix)     On January 31, 2018, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named MS, supposedly to determine whether MS suffered from radiculopathy.

(x)      On May 14, 2018, Northern PT, Mah, Choi, Song, and Felderstein purported to provide a four–limb EMG to an Insured named ML, supposedly to determine whether ML suffered from radiculopathy.

249.    In the vast majority of the EMG claims identified in Exhibit "1", Northern PT, Mah, Choi, Song, and Felderstein purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

d.      **The Fraudulent Radiculopathy "Diagnoses"**

250.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large–scale, peer–reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

251. Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom Northern PT, Mah, Choi, Song, and Felderstein purported to treat.

252. As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

253. As set forth above, virtually none of the Insureds whom Northern PT, Mah, Choi, Song, and Felderstein purportedly treated suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

254. Even so, in the EMG and NCV claims identified in Exhibit "1", Northern PT, Mah, Choi, Song, and Felderstein falsely purported to identify radiculopathies in most of the Insureds to whom they purported to provide EMG and NCV testing.

255. Northern PT, Mah, Choi, Song, and Felderstein purported to arrive at their pre–determined radiculopathy "diagnoses" in order to create the false appearance of severe injuries and thereby provide a false justification for the continued, medically unnecessary Fraudulent Services.

**4.    The Fraudulent Charges for Chiropractic and Physical Therapy Services at Northern PT**

256. In addition to the fraudulent patient examinations, Northern PT, Mah, Choi, and Song purported to subject many Insureds to months of medically unnecessary chiropractic/physical therapy services, which they then billed to GEICO.

257. Choi purported to perform the vast majority of the putative physical therapy services that were billed through Northern PT to GEICO.

258.     Mah purported to perform virtually all of the putative chiropractic services that were billed through Northern PT to GEICO.

259.     As set forth in in Exhibit "1", Northern PT, Mah, Choi, and Song typically billed the putative chiropractic/physical therapy services to GEICO under CPT codes 98940, 98941, 98942, 97010, 97012, 97014, 97026, 97035, 97039, 97110, 97139, 97140, and 97150.

260.     Like the charges for the other Fraudulent Services, the charges for the chiropractic/physical therapy services were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit to GEICO, not to treat or otherwise benefit the Insureds who were subjected to them.

261.     Moreover, in the claims for chiropractic/physical therapy services identified in Exhibit "1", the charges for the chiropractic/physical therapy services were fraudulent in that they misrepresented Northern PT's eligibility to collect PIP Benefits in the first instance.

262.     In fact, Northern PT never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because, as a result of the fraudulent scheme described herein, neither Northern PT nor the treatments were in compliance with relevant laws and regulations governing healthcare practice.

263.     What is more, and as set forth above, many of the Insureds in the claims identified in Exhibit "1" were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

264.     To the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their relatively minor automobile accidents, the injuries were minor soft tissue injuries such as sprains or strains, which were not severe at all.

265.     Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

266.     Even so, in many of the claims for chiropractic/physical therapy treatment identified in Exhibit "1", Northern PT, Mah, Choi, and Song routinely purported to provide medically unnecessary chiropractic/physical therapy treatment to Insureds who had been involved in relatively minor accidents – and who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – for months after the underlying accidents, and long after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

267.     For example:

(i)     On December 9, 2014, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within four months of the accident, and did not require over four months of chiropractic/physical therapy treatment. Even so, between May 2015 and September 2015, Mah, Choi, Northern PT, and Song purported to provide PK with four months of purported chiropractic/physical therapy "treatment".

(ii)     On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within eight months of the accident, and did not require over eight months of chiropractic/physical therapy treatment. Even so, between September 2015 and June 2016, Mah, Choi, Northern PT, and Song purported to provide NK with over eight months of purported chiropractic/physical therapy "treatment".

(iii)    On December 12, 2015, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that EL complained neck and back pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within a year of the accident, and did not require over eleven months of chiropractic/physical therapy treatment. Even so, between March 2016 and March 2017, Mah, Choi, Northern PT, and Song purported to provide EL with over eleven months of purported chiropractic/physical therapy "treatment".

(iv)    On August 11, 2016, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within five months of the accident, and did not require over five months of physical therapy treatment. Even so, between August 2016 and February 2017, Mah, Choi, Northern PT, and Song purported to provide CY with over five months of purported chiropractic/physical therapy "treatment".

(v)    On May 30, 2017, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within seven months of the accident, and did not require over seven months of chiropractic/physical therapy treatment. Even so, between May 2017, and December 2017, Mah, Choi, Northern PT, and Song purported to provide SK with over seven months of purported chiropractic/physical therapy "treatment".

268.    It is extremely improbable that any two Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

269.     It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at Northern PT with substantially similar injuries <u>on or about the exact same dates</u> after their accidents.

270.     Even so, in keeping with the fact that Northern PT's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Northern PT, Mah, Choi, and Song frequently recommended and provided a substantially similar course of medically unnecessary "treatment" to more than one Insured involved in a single accident.

271.     For example:

(i)      On November 17, 2015, two Insureds – EP and SP – were involved in the same automobile accident. Thereafter, EP and SP both presented – incredibly, on the exact same date, December 31, 2015 – to Northern PT for purported initial examinations by Mah. EP and SP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between December 2015 and December 2016, Northern PT, Mah, Choi, and Song provided EP and SP with a substantially similar course of purported chiropractic/physical therapy treatment.

(ii)     On October 17, 2016, two Insureds – KK and DS – were involved in the same automobile accident. Thereafter, KK and DS both presented – incredibly, on the exact same date, October 17, 2016 – to Northern PT for purported initial examinations by Mah. KK and DS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between October 2016 and June 2017, Northern PT, Mah, Choi, and Song provided KK and DS with a substantially similar course of purported chiropractic/physical therapy treatment.

(iii)    On May 12, 2017, two Insureds – DL and SL – were involved in the same automobile accident. Thereafter, DL and SL both presented – incredibly, on the exact same date, May 12, 2017 – to Northern PT for purported initial examinations by Mah. DL and SL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between May 2017 and February 2018, Northern PT, Mah, Choi,

and Song provided DL and SL with a substantially similar course of purported chiropractic/physical therapy treatment.

(iv)     On May 13, 2017, two Insureds – JG and AV – were involved in the same automobile accident. Thereafter, JG and AV both presented – incredibly, on the exact same date, May 17, 2017 – to Northern PT for purported initial examinations by Mah. JG and AV were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between May 2017 and April 2018, Northern PT, Mah, Choi, and Song provided JG and AV with a substantially similar course of purported chiropractic/physical therapy treatment.

(v)      On May 30, 2017, two Insureds – SP and SK – were involved in the same automobile accident. Thereafter, SP and SK both presented – incredibly, on the exact same date, May 31, 2017 – to Northern PT for purported initial examinations by Mah. SP and SK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between May 2017 and December 2017, Northern PT, Mah, Choi, and Song provided SP and SK with a substantially similar course of purported chiropractic/physical therapy treatment.

(vi)     On September 30, 2017, two Insureds – JC and VO – were involved in the same automobile accident. Thereafter, JC and VO both presented – incredibly, on the exact same date, October 6, 2017 – to Northern PT for purported initial examinations by Mah. JC and VO were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between October 2017 and April 2018, Northern PT, Mah, Choi, and Song provided JC and VO with a substantially similar course of purported chiropractic/physical therapy treatment.

(vii)    On November 22, 2017, two Insureds – YK and HL – were involved in the same automobile accident. Thereafter, YK and HL both presented – incredibly, on the exact same date, December 30, 2017 – to Northern PT for purported initial examinations by Mah. YK and HL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between November 2017 and October 2018, Northern PT, Mah, Choi, and Song provided YK and HL with a substantially similar course of purported chiropractic/physical therapy treatment.

(viii)   On November 26, 2017 – two Insureds – MS and JP – were involved in the same automobile accident. Thereafter, MS presented on December 1, 2017 to Northern PT for a purported initial examination by Mah. Then, JP presented the next day –

on December 2, 2017 to Northern PT for a purported initial examination by Mah. MS and JP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between December 2017 and April 2018, Northern PT, Mah, Choi, and Song provided MS and JP with a substantially similar course of purported physical therapy treatment.

(ix)    On February 18, 2019, two Insureds – HY and HY – were involved in the same automobile accident. Thereafter, HY and HY both presented – incredibly, on the exact same date, February 19, 2019 – to Northern PT for purported initial examinations by Mah. HY and HY were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between February 2019 and August 2019, Northern PT, Mah, Choi, and Song provided HY and HY with a substantially similar course of purported chiropractic treatment.

(x)    On May 21, 2019, two Insureds – JJ and JY – were involved in the same automobile accident. Thereafter, JJ and JY both presented – incredibly, on the exact same date, June 14, 2019 – to Northern PT for purported initial examinations by Mah. JJ and JY were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between June 2019 and April 2020, Northern PT, Mah, Choi, and Song provided JJ and JY with a substantially similar course of purported chiropractic/physical therapy treatment.

272.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Northern PT, Mah, Choi, and Song frequently recommended and purported to provide a substantially similar course of medically unnecessary "chiropractic treatment" and/or "physical therapy treatment" to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated and in any case did not require the treatment.

## 5.    The Fraudulent Charges for Acupuncture at Northern PT

273.    In addition to the fraudulent patient examinations and medically unnecessary chiropractic/physical therapy services, Northern PT, Mah, Choi, Song, and Rim purported to subject many Insureds to a series of medically unnecessary acupuncture treatments.

274.     Song and Rim purported to perform the vast majority of the putative acupuncture treatments that were billed through Northern PT to GEICO.

275.     As set forth in in Exhibit "1", Northern PT, Mah, Choi, Song, and Rim typically billed the putative acupuncture services to GEICO under CPT codes 97810, 97811, 97813, and 97814.

276.     Like the charges for the other Fraudulent Services, the charges for the acupuncture treatments identified in Exhibit "1" were fraudulent in that the treatments were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit to GEICO, not to treat or otherwise benefit the Insureds who were subjected to them.

277.     Moreover, in the claims for acupuncture treatments identified in Exhibit "1", the charges for the acupuncture treatments were fraudulent in that they misrepresented Northern PT's eligibility to collect PIP Benefits in the first instance.

278.     In fact, Northern PT never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because, as a result of the fraudulent scheme described herein, neither Northern PT nor the treatments were in compliance with relevant laws and regulations governing healthcare practice.

a.      **Legitimate Use of Acupuncture**

279.     Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi" or "Qi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma.  When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be

inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

280.     The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity. Since every individual has a unique Chi, acupuncture treatment should be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

281.     Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and to eventually return the patient to maximum health.

282.     Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) acupuncture examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) patient's progress throughout the course of treatment.

283.     In contrast to legitimate acupuncture practices, Northern PT, Mah, Choi, Song, and Rim treated each patient without regard to any individualized treatment strategies, without regard to any necessary adjustments in treatment as treatment progressed over time, and without meaningful, genuine, and individualized documentation of the course of acupuncture treatment.

284.     In fact, no genuine effort was made to treat the Insureds' actual injuries, to properly assess their condition, to monitor their improvement or lack thereof, or to adjust the treatment to reflect the patients' improvement or lack of improvement.

285. At best, the purported "acupuncture" services provided Northern PT, Mah, Choi, Song, and Rim consisted of inserting needles into Insureds in an assembly-line fashion that bore no real relation to the Insured's condition, and instead reflected a pre-determined protocol designed to maximize the amount of fraudulent charges the Defendants could submit to GEICO and other insurers.

**b.** **The Medically Unnecessary Acupuncture Treatments**

286. By the time the Insureds in the claims identified in Exhibit "1" presented to Northern PT for acupuncture, they either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of resolving. The Insureds did not require continued, long-term acupuncture treatments.

287. In keeping with the fact that Northern PT's acupuncture "treatments" were not predicated on medical necessity, Northern PT's own records frequently indicated that the previous, extensive acupuncture "treatments" that the Insureds had received had not been effective in resolving the Insureds' purportedly persistent symptoms and complaints.

288. For example:

(i) On December 9, 2014, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within a few months of the accident, and did not require over three months of acupuncture treatment. Even so, between June 2015 and September 2015, Song, Northern PT, Mah, and Choi purported to provide PK with over three months of purported acupuncture "treatment".

(ii) On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the

accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within a few months of the accident, and did not require over five months of acupuncture treatment. Even so, between December 2015 and June 2016, Song, Northern PT, Mah, and Choi purported to provide NK with over five months of purported acupuncture "treatment".

(iii)    On December 12, 2015, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision. The police report further indicated that EL complained neck and back pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low or minimal severity. To the extent that EL experienced any health problems at all as the result of the accident, they were low or minimal severity at the outset, had completely resolved within a few months of the accident, and did not require over eleven months of acupuncture treatment. Even so, between March 2016 and March 2017, Song, Rim, Northern PT, Mah, and Choi purported to provide EL with over eleven months of purported acupuncture "treatment".

(iv)    On August 11, 2016, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within a few months of the accident, and did not require over three months of acupuncture treatment. Even so, between September 2016 and December 2016, Song, Rim, Northern PT, Mah, and Choi purported to provide CY with over three months of purported acupuncture "treatment".

(v)    On May 30, 2017, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, had completely resolved within a few months of the accident, and did not require over six months of acupuncture treatment. Even so, between May 2017 and December 2017, Rim, Northern PT,

Mah, Choi, and Song purported to provide SK with over six months of purported acupuncture "treatment".

289.     These are only representative examples. In the claims for acupuncture services that are identified in Exhibit "1", Northern PT, Mah, Choi, Song, and Rim frequently provided acupuncture treatments that were not predicated on medical necessity.

290.     The Defendants' fraudulent scheme enabled them to bill for months of medically unnecessary acupuncture treatment per Insured, without regard for the Insureds' true circumstances or presentation.

6.     **The Fraudulent Charges for Initial Examinations at the Bethel Practices**

291.     In the claims identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho purported to provide virtually every Insured with an initial examination.

292.     As set forth in Exhibit "2", Cho purported to perform virtually all of the putative initial examinations at Bethel Anesthesia, which were typically billed to GEICO under CPT code 99244, typically resulting in a charge of $350.00 for each initial examination they purported to provide.

293.     As set forth in Exhibit "3", Cho purported to perform virtually all of the putative initial examinations at Bethel Interventional, which were typically billed to GEICO under CPT codes 99244 and 99204, typically resulting in a charge of $350.00 for each initial examination they purported to provide.

294.     In fact, Bethel Anesthesia and Bethel Interventional never were eligible to collect PIP Benefits in connection with the claim identified in Exhibits "1" and "2", because – as a result of the fraudulent and unlawful conduct described herein – neither Bethel Anesthesia, Bethel Interventional nor the examinations were in compliance with the relevant laws and regulations governing healthcare practice.

295.    The charges for the initial examinations also were fraudulent in that they misrepresented the nature, extent, and results of the putative examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

296.    In the claims for initial examinations under CPT code 99244 that are identified in Exhibit "2", Bethel Anesthesia and Cho routinely misrepresented the severity of the Insureds' presenting problems.

297.    Similarly, in the claims for initial examinations under CPT codes 99244 and 99204 that are identified in Exhibit "3", Bethel Interventional and Cho routinely misrepresented the severity of the Insureds' presenting problems.

298.    At all relevant times, pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT codes 99204 and 99244 to bill for an initial patient examination typically required that the patient present with problems of moderate to high severity.

299.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99204 or 99244 to bill for an initial patient examination.

300.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)     Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)     Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)     Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

301.     Similarly, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99244 to bill for an initial patient examination:

(i)     Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (Colon and Rectal Surgery)

(ii)     Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)     Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

302.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99204 or 99244 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

303.     By contrast, to the extent that the Insureds in the claims identified in Exhibits "2" and "3" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

304.     Even so, in the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely billed for their putative initial

examinations using CPT codes 99204 and 99244, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

305.    For example:

(i)    On July 26, 2013, an Insured named HH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that HH's vehicle was drivable following the accident. The police report further indicated that HH was not injured and did not complain of any pain at the scene. In keeping with the fact that HH was not seriously injured, HH did not visit any hospital emergency room following the accident. To the extent that HH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of HH by Cho on March 26, 2014 – eight months after the accident – Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On February 22, 2014, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of SH by Cho on May 20, 2014, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On March 21, 2014, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JG's vehicle was drivable following the accident. The police report further indicated that, although JG complained of back pain, JG refused medical attention at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JG by Cho on October 21, 2014 – seven months after the accident – Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On August 11, 2014, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JH by Cho on September 19, 2014, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)    On August 19, 2014, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that, although RC complained of shoulder pain, RC refused medical attention at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of RC by Cho on October 21, 2014, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On November 10, 2014, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DO's vehicle was drivable following the accident. The police report further indicated that DO was not injured and did not complain of any pain at the scene. In keeping with the fact that DO was not seriously injured, DO did not visit any hospital emergency room following the accident. To the extent that DO experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of DO by Cho on February 24, 2015 – three months after the accident – Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On December 9, 2014, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over

time. Even so, following a purported initial examination of PK by Cho on March 31, 2015 – more than three months after the accident – Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)  On March 22, 2015, an Insured named JU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JU's vehicle was drivable following the accident. The police report further indicated that JU was not injured and did not complain of any pain at the scene. In keeping with the fact that JU was not seriously injured, JU did not visit any hospital emergency room following the accident. To the extent that JU experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of JU by Cho on July 21, 2015, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)  On May 8, 2015, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured and did not complain of any pain at the scene. In keeping with the fact that YS was not seriously injured, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YS by Cho on May 12, 2015, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)  On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of NK by Cho on October 6, 2015, Cho and Bethel Interventional billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)     On November 28, 2015, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of CY by Cho on December 15, 2015, Cho and Bethel Interventional billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)    On November 28, 2015, an Insured named YY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that YY's vehicle was drivable following the accident. The police report further indicated that YY was not injured and did not complain of any pain at the scene. In keeping with the fact that YY was not seriously injured, YY did not visit any hospital emergency room following the accident. To the extent that YY experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YY by Cho on December 15, 2015, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)   On August 7, 2016, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of NC by a nurse practitioner named Younjea Lee on September 2, 2016, Lee, Cho, and Bethel Interventional billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)    On October 9, 2018, an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health problems at all as the result of the accident, they were of

low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of AH by Cho on February 1, 2019, Cho and Bethel Interventional billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv) On June 28, 2019, an Insured named YK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that YK's vehicle was drivable following the accident. The police report further indicated that YK was not injured and did not complain of any pain at the scene. In keeping with the fact that YK was not seriously injured, YK did not visit any hospital emergency room following the accident. To the extent that YK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of YK by Cho on January 3, 2020, Cho and Bethel Interventional billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

306. These are only representative examples. In many of the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the examinations.

307. In the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99204 and 99244, because examinations billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

308. In the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho also routinely falsely represented that the Insureds

presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

309.     What is more, in the claims for purported initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho misrepresented the amount of time that was spent on the putative examinations.

310.     Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for an initial examination represents that the physician or other healthcare provider who performed the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

311.     Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician or other healthcare provider who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

312.     As set forth in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho submitted the vast majority of their billing for initial examinations under CPT codes 99244 and 99204, and thereby represented that the physician or other healthcare provider who purported to perform the initial examinations spent 60 or 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

313.     In fact, in the claims for initial examinations identified in Exhibits "2" and "3", neither Cho, nor any other healthcare provider associated with Bethel Anesthesia or Bethel Interventional ever spent 45 minutes – much less 60 minutes – of face-to-face time with the Insureds or their families when conducting the examinations.

314.     Rather, in the claims for initial examinations identified in Exhibits "2" and "3", the initial examinations did not entail more than 15 or 20 minutes of face-to-face time between the

examining physician or other healthcare provider and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

315.     For instance, and in keeping with the fact that the initial examinations allegedly provided through the Bethel Anesthesia and Bethel Interventional did not entail more than 15 or 20 minutes of face-to-face time with the Insureds or their families, Bethel Anesthesia, Bethel Interventional, and Cho used a template form in purporting to conduct the initial examinations.

316.     The template that Cho used to document the putative examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

317.     All that was required to complete the template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other basic forms of testing.

318.     These interviews and examinations did not require any physician or other healthcare provider associated with Bethel Anesthesia or Bethel Interventional to spend more than 15 or 20 minutes of face-to-face time with the Insureds or their families during the putative initial examinations.

319.     In the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho falsely represented that the examinations involved at least 45 minutes of face-to-face time with the Insureds or their families (when billed under CPT code 99204), and 60 minutes (when billed under CPT code 99244), in order to create a false basis for their charges under CPT codes 99204 and 99244 because examinations billable under CPT codes 99204 and 99244 are reimbursable at a higher rate than examinations that require less time to perform.

### c. Misrepresentations Regarding "Comprehensive" Physical Examinations

320. Moreover, in the claims identified in Exhibits "2" and "3" for initial examinations under CPT codes 99204 and 99244, Bethel Anesthesia, Bethel Interventional, and Cho falsely represented the extent of the underlying physical examinations.

321. At all relevant times, pursuant to the CPT Assistant, the use of CPT codes 99204 and 99244 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

322. According to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

323. Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

324. The CPT Assistant recognizes the following organ systems:

(i) constitutional symptoms (e.g., fever, weight loss);

(ii) eyes;

(iii) ears, nose, mouth, throat;

(iv) cardiovascular;

(v) respiratory;

(vi) gastrointestinal;

(vii) genitourinary;

(viii) musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

325.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

326.    In the claims for initial examinations identified in Exhibits "2" and "3", when Bethel Anesthesia, Bethel Interventional, and Cho billed for the initial examinations under CPT codes 99204 and 99244, they falsely represented that the physician or other healthcare provider associated with Bethel Anesthesia or Bethel Interventional who purported to perform the examinations performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

327.    In fact, with respect to the claims for initial examinations under CPT codes 99204 and 99244 that are identified in Exhibits "2" and "3", neither Cho, nor any other healthcare provider associated with Bethel Anesthesia or Bethel Interventional ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

328.    For instance, in each of the claims under CPT codes 99204 and 99244 identified in Exhibits "2" and "3", neither Cho, nor any other healthcare provider associated with Bethel Anesthesia or Bethel Interventional ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

329.    Furthermore, although Bethel Anesthesia, Bethel Interventional, and Cho often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during the initial examinations in the claims identified in Exhibits "2" and "3", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

330.    Rather, to the extent that the Defendants conducted any initial examinations at all with respect to the claims identified in Exhibits "2" and "3", the examinations consisted of a perfunctory check of the Insureds' musculoskeletal systems that was insufficient to qualify as a complete examination of the Insureds' musculoskeletal systems.

331.    For example:

(i)    On October 28, 2014, Cho and Bethel Anesthesia billed GEICO under CPT code 99244 for an initial examination that Cho purported to perform on an Insured named HY, and thereby represented that they had provided a "comprehensive" physical examination to HY. However, Cho did not document findings with respect to at least eight of HY's organ systems, nor did he document a "complete" examination of HY's musculoskeletal system, despite the fact that – to the extent that HY had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)    On November 14, 2014, Cho and Bethel Anesthesia billed GEICO under CPT code 99244 for an initial examination that Cho purported to perform on an Insured named MK, and thereby represented that they had provided a "comprehensive" physical examination to MK. However, Cho did not document findings with respect to at

least eight of MK's organ systems, nor did he document a "complete" examination of MK's musculoskeletal system or any of MK's other organ systems.

(iii)    On March 31, 2015, Cho and Bethel Anesthesia billed GEICO under CPT code 99244 for an initial examination that Cho purported to perform on an Insured named PK, and thereby represented that they had provided a "comprehensive" physical examination to PK. However, Cho did not document findings with respect to at least eight of PK's organ systems, nor did he document a "complete" examination of PK's musculoskeletal system, despite the fact that – to the extent that PK had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)    On April 21, 2015, Cho and Bethel Anesthesia billed GEICO under CPT code 99244 for an initial examination that Cho purported to perform on an Insured named GK, and thereby represented that they had provided a "comprehensive" physical examination to GK. However, Cho did not document findings with respect to at least eight of GK's organ systems, nor did he document a "complete" examination of GK's musculoskeletal system, despite the fact that – to the extent that GK had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(v)    On June 2, 2015, Cho and Bethel Anesthesia billed GEICO under CPT code 99244 for an initial examination that Cho purported to perform on an Insured named MK, and thereby represented that they had provided a "comprehensive" physical examination to MK. However, Cho did not document findings with respect to at least eight of MK's organ systems, nor did he document a "complete" examination of MK's musculoskeletal system, despite the fact that – to the extent that MK had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On June 6, 2016, Cho and Bethel Interventional billed GEICO under CPT code 99244 for an initial examination that Cho purported to perform on an Insured named SK, and thereby represented that they had provided a "comprehensive" physical examination to SK. However, Cho did not document findings with respect to at least eight of SK's organ systems, nor did he document a "complete" examination of SK's musculoskeletal system, despite the fact that – to the extent that SK had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On September 25, 2017, a nurse practitioner named Younjea Lee, Cho, and Bethel Interventional billed GEICO under CPT code 99244 for an initial examination that Lee purported to perform on an Insured named IC, and thereby represented that they had provided a "comprehensive" physical examination to IC. However, Lee did not document findings with respect to at least eight of IC's organ systems, nor did Lee document a "complete" examination of IC's musculoskeletal system,

despite the fact that – to the extent that IC had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(viii) On September 16, 2020, Cho and Bethel Interventional billed GEICO under CPT code 99204 for an initial examination that Cho purported to perform on an Insured named HS, and thereby represented that they had provided a "comprehensive" physical examination to HS. However, Cho did not document findings with respect to at least eight of HS's organ systems, nor did he document a "complete" examination of HS's musculoskeletal system, despite the fact that – to the extent that HS had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(ix) On November 11, 2020, Cho and Bethel Interventional billed GEICO under CPT code 99204 for an initial examination that Cho purported to perform on an Insured named YC, and thereby represented that they had provided a "comprehensive" physical examination to YC. However, Cho did not document findings with respect to at least eight of YC's organ systems, nor did he document a "complete" examination of YC's musculoskeletal system, despite the fact that – to the extent that YC had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(x) On January 27, 2021, Cho and Bethel Interventional billed GEICO under CPT code 99204 for an initial examination that Cho purported to perform on an Insured named SJ, and thereby represented that they had provided a "comprehensive" physical examination to SJ. However, Cho did not document findings with respect to at least eight of SJ's organ systems, nor did he document a "complete" examination of SJ's musculoskeletal system, despite the fact that – to the extent that SJ had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

332.    These are only representative examples. In the claims for initial examinations under CPT codes 99204 and 99244 that are identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely represented that they had provided "comprehensive" physical examinations, and that their putative examinations therefor were billable under CPT codes 99204 and 99244, because examinations that are billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations that do not require "comprehensive" patient examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

333.    Furthermore, at all relevant times, the use of CPT codes 99244 and 99204 to bill for a patient examination represented that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

334.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

335.    The CPT Assistant provides various clinical examples of the types of presenting problems that would require "moderate complexity" medical decision-making, so as to justify the use of CPT codes 99204 and 99244 to bill for an initial patient examination.

336.    For example, the CPT Assistant provides the following clinical examples of presenting problems that legitimately could require moderately complex medical decision-making, and would support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)    Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

337.    Likewise, the CPT Assistant provides the following clinical examples of presenting problems that legitimately could require moderately complex medical decision-making, and would support the use of CPT code 99244 to bill for an initial patient examination:

(i)    Office consultation with 38–year–old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra–abdominal abscess. (Colon and Rectal Surgery)

(ii)    Initial office consultation for discussion of treatment options for a 40–year–old female with a two–centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)    Initial office consultation with 72–year–old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

338.    Accordingly, pursuant to the CPT Assistant, the moderately complex medical decision-making that could support the use of CPT codes 99244 and 99204 to bill for an initial patient examination or consultation typically involves problems that pose a serious threat to the patient's health, or even the patient's life.

339.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "2" and "3", had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

340.    The diagnosis and treatment of these soft tissue injuries did not require any moderate complexity medical decision-making.

341.    Though Bethel Anesthesia, Bethel Interventional, and Cho routinely billed for their putative initial examinations using CPT codes 99204 and 99244, and thereby falsely represented that the examinations involved "moderate complexity" medical decision-making, in fact the examinations did not involve any legitimate medical decision-making at all.

342. First, in the most of claims for initial examinations identified in Exhibits "2" and "3", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

343. When the Insureds in the claims identified in Exhibits "2" and 3" presented to Bethel Anesthesia or Bethel Interventional for "treatment", the typically did not arrive with any medical records except, at times, basic radiology reports.

344. Furthermore, prior to the initial examinations, Bethel Anesthesia, Bethel Interventional, and Cho typically neither requested any medical records from any other providers, nor conducted any diagnostic tests.

345. Second, in the claims for initial examinations identified in Exhibits "2" and "3", there was no risk of significant complication or morbidity – much less mortality – from the Insureds' relatively minor soft–tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

346. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

347. In most cases, any "treatments" that the Defendants actually provided were limited to chiropractic treatment, physical therapy treatment, acupuncture treatment, electrodiagnostic testing, and/or interventional pain management, none of which was health– or life–threatening if properly administered.

348.    Third, in most of the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

349.    Rather, to the extent that the initial examinations were conducted in the first instance, Bethel Anesthesia, Bethel Interventional, and Cho provided a phony series of objectively unverifiable soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially identical course of treatment for the majority of Insureds, regardless of the individual circumstances regarding the Insured's purported injuries and/or complaints of pain.

350.    Specifically, in the vast majority of claims identified in Exhibits "2" and "3", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

351.    Even so, Bethel Anesthesia, Bethel Interventional, and Cho prepared initial examination reports in which they provided a phony series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

352.    Then, based upon these phony "diagnoses", Bethel Anesthesia, Bethel Interventional, and Cho directed Insureds: (i) in most cases, to receive substantially similar and medically unnecessary conservative therapy – namely chiropractic, physical therapy, and/or acupuncture treatments; (ii) in many cases, to receive interventional pain management; and/or (iii) in many cases, to receive electrodiagnostic testing, regardless of the individual circumstances.

353.    For example:

(i)     On July 26, 2013, an Insured named HH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that HH's vehicle was drivable following the accident. The police report further indicated that HH was not injured and did not complain of any pain at the scene. In keeping with the fact that HH was not seriously injured, HH did not visit any hospital emergency room following the accident. To the extent that HH

experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 26, 2014, Cho purported to conduct an initial examination of HH on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided HH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HH's presenting problems, nor the treatment plan provided to HH by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, HH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative therapy and electrodiagnostic testing, which did not pose the least bit of risk to HH. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On February 22, 2014, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 20, 2014, Cho purported to conduct an initial examination of SH on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided SH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SH's presenting problems, nor the treatment plan provided to SH by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, SH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative therapy and electrodiagnostic testing, which did not pose the least bit of risk to SH. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On March 21, 2014, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was low-impact

collision and that JG's vehicle was drivable following the accident. The police report further indicated that, although JG complained of back pain, JG refused medical treatment at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 21, 2014, Cho purported to conduct an initial examination of JG on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided JG with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative and interventional pain management, which did not pose the least bit of risk to JG. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On August 11, 2014, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 19, 2014, Cho purported to conduct an initial examination of JH on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided JH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative therapy, diagnostic imaging services, trigger point injections, and pain medication, which did not pose the least bit of risk to JH. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that

Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On December 9, 2014, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On March 31, 2015, Cho purported to conduct an initial examination of PK on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided PK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PK's presenting problems, nor the treatment plan provided to PK by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, PK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative therapy and interventional pain management, which did not pose the least bit of risk to PK. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On March 22, 2015, an Insured named JU was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that JU's vehicle was drivable following the accident. The police report further indicated that JU was not injured and did not complain of any pain at the scene. In keeping with the fact that JU was not seriously injured, JU did not visit any hospital emergency room following the accident. To the extent that JU experienced any health problems at all as the result of the accident, they were of low or minimal severity. On July 21, 2015, Cho purported to conduct an initial examination of JU on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided JU with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JU's presenting problems, nor the treatment plan provided to JU by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, JU did not need any extensive treatment at all as a result of the accident, and the treatment plan

provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative therapy and electrodiagnostic testing, which did not pose the least bit of risk to JU. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On May 8, 2015, an Insured named YS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that YS's vehicle was drivable following the accident. The police report further indicated that YS was not injured and did not complain of any pain at the scene. In keeping with the fact that YS was not seriously injured, YS did not visit any hospital emergency room following the accident. To the extent that YS experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 12, 2015, Cho purported to conduct an initial examination of YS on behalf of Bethel Anesthesia. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided YS with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YS's presenting problems, nor the treatment plan provided to YS by Cho and Bethel Anesthesia, presented any risk of significant complications, morbidity, or mortality. To the contrary, YS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Anesthesia consisted of medically unnecessary conservative therapy and diagnostic imaging services, which did not pose the least bit of risk to YS. Even so, Cho and Bethel Anesthesia billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)    On August 7, 2016, an Insured named NC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that NC's vehicle was drivable following the accident. The police report further indicated that NC was not injured and did not complain of any pain at the scene. In keeping with the fact that NC was not seriously injured, NC did not visit any hospital emergency room following the accident. To the extent that NC experienced any health problems at all as the result of the accident, they were of low severity. On September 2, 2016, a nurse practitioner named Younjea Lee purported to conduct an initial examination of NC on behalf of Bethel Interventional. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lee provided NC with the substantially similar, phony list of objectively unverifiable soft tissue

injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NC's presenting problems, nor the treatment plan provided to NC by Lee, Cho, and Bethel Interventional, presented any risk of significant complications, morbidity, or mortality. To the contrary, NC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lee, Cho, and Bethel Interventional consisted of medically unnecessary conservative therapy, diagnostic imaging services, and interventional pain management, which did not pose the least bit of risk to NC. Even so, Lee, Cho, and Bethel Interventional billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On October 9, 2018, an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 1, 2019, Cho purported to conduct an initial examination of AH on behalf of Bethel Interventional. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided AH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AH's presenting problems, nor the treatment plan provided to AH by Cho and Bethel Interventional, presented any risk of significant complications, morbidity, or mortality. To the contrary, AH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Interventional consisted of medically unnecessary conservative therapy, interventional pain management, and diagnostic imaging services, which did not pose the least bit of risk to AH. Even so, Cho and Bethel Interventional billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On June 28, 2019, an Insured named YK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that YK's vehicle was drivable following the accident. The police report further indicated that YK was not injured and did not complain of any pain at the scene. In keeping with the fact that YK was not seriously injured, YK did not visit any hospital emergency room following the accident. To the extent that YK experienced any health problems at all as the result of the accident, they were of low or minimal severity. On January 3, 2020, Cho purported to conduct an initial examination of YK on behalf of Bethel Interventional. Cho did not retrieve, review,

or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided YK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YK's presenting problems, nor the treatment plan provided to YK by Cho and Bethel Interventional, presented any risk of significant complications, morbidity, or mortality. To the contrary, YK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Cho and Bethel Interventional consisted of medically unnecessary conservative therapy, which did not pose the least bit of risk to YK. Even so, Cho and Bethel Interventional billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Cho engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

354. It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "2" and "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

355. It is even more improbable – to the point of impossibility – that this would occur repeatedly, oftentimes with the Insureds presenting for initial examinations at Bethel Anesthesia or Bethel Interventional with substantially identical injuries on or about the exact same dates after their accidents.

356. Even so, in keeping with the fact that Bethel Anesthesia, Bethel Interventional, and Cho's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Bethel Anesthesia, Bethel Interventional, and Cho often issued substantially similar, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and/or recommended a substantially similar course of medically unnecessary "treatment" to the Insureds.

357. For example:

(i)     On January 5, 2013, two Insureds – SM and SP were involved in the same automobile accident. Thereafter, SM and SP both presented – incredibly, on the exact same date, January 11, 2013 – to Bethel Anesthesia for purported initial examinations by Cho. SM and SP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided SM and SP with substantially similar "diagnoses" for both of them.

(ii)    On May 10, 2014, two Insureds – XL and LZ – were involved in the same automobile accident. Thereafter, XL and LZ both presented – incredibly, on the exact same date, July 7, 2014 – to Bethel Anesthesia for purported initial examinations by Cho. XL and LZ were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided XL and LZ with substantially similar "diagnoses" for both of them.

(iii)   On July 29, 2014, two Insureds – AC and SR – were involved in the same automobile accident. Thereafter, AC and SR both presented – incredibly, on the exact same date, August 8, 2014 – to Bethel Anesthesia for purported initial examinations by Cho. AC and SR were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided AC and SR with substantially similar "diagnoses" for both of them.

(iv)    On October 23, 2014, two Insureds – YC and HK – were involved in the same automobile accident. Thereafter, YC and HK both presented – incredibly, on the exact same date, January 15, 2015 – to Bethel Anesthesia for purported initial examinations by Cho. YC and HK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided YC and HK with substantially similar "diagnoses" for both of them.

(v)     On November 3, 2014, three Insureds – SA, EJ, and SJ – were involved in the same automobile accident. Thereafter, SA, EJ, and SJ all presented – incredibly, on the exact same date, November 4, 2014 – to Bethel Anesthesia for purported initial examinations by Cho. SA, EJ, and SJ were different ages, in different physical conditions, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided SA, EJ, and SJ with substantially similar "diagnoses" for all of them.

(vi)     On March 24, 2015, two Insureds – SB and NK – were involved in the same automobile accident. Thereafter, SB and NK both presented – incredibly, on the exact same date, March 25, 2015 – to Bethel Anesthesia for purported initial examinations by Cho. SB and NK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided SB and NK with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(vii)    On May 12, 2017, two Insureds – DL and SL – were involved in the same automobile accident. Thereafter, DL and SL both presented – incredibly, on the exact same date, May 15, 2017 – to Bethel Interventional for purported initial examinations by Cho. DL and SL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided DL and SL with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(viii)   On May 13, 2017, two Insureds – GJ and AV – were involved in the same automobile accident. Thereafter, GJ and AV both presented – incredibly, on the exact same date, May 17, 2017 – to Bethel Interventional for purported initial examinations by Cho. GJ and AV were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Cho provided GJ and AV with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ix)     On October 1, 2017, two Insureds – WC and SK – were involved in the same automobile accident. Thereafter, WC and SK both presented – incredibly, on the exact same date, October 2, 2017 – to Bethel Interventional for purported initial examinations by a nurse practitioner named Younjea Lee. WC and SK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Lee provided WC and SK with substantially similar "diagnoses" for both of them.

(x)      On March 28, 2020, two Insureds – SJ and SJ – were involved in the same automobile accident. Thereafter, SJ and SJ both presented – incredibly, on the exact same date, January 27, 2021 – to Bethel Interventional for purported initial examinations by Cho. SJ and SJ were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries

at all. Even so, at the conclusion of the putative initial examinations, Cho provided SJ and SJ with substantially identical "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

358. These are only representative examples. In the claims for initial examinations that are identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho often issued substantially similar "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and/or recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and in any case did not require the treatment.

359. Bethel Anesthesia, Bethel Interventional, and Cho routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

360. In the claims for initial examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely represented that the putative examinations involve "moderate complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99244, because examinations billable under CPT codes 99204 and 99244 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

7. **The Fraudulent Charges for Follow-Up Examinations at the Bethel Practices**

361. In addition to the fraudulent initial examinations, Bethel Anesthesia, Bethel Interventional, and Cho typically purported to subject the Insureds in the claims identified in

Exhibits "2" and "3" to at least one, but often multiple, fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

362.     As set forth in Exhibit "2", Cho purported to perform virtually all of the putative follow-up examinations at Bethel Anesthesia, which were typically billed to GEICO under CPT code 99214, typically resulting in a charge of $245.00 for each purported follow-up examination.

363.     Similarly, as set forth in Exhibit "3", Cho purported to perform the majority of the putative follow-up examinations at Bethel Interventional, which were then billed to GEICO under CPT codes 99214, typically resulting in a charge of either $92.98 or $245.00 for each purported follow-up examination.

364.     In the claims for follow-up examinations identified in Exhibits "2" and "3", the charges for the follow-up examinations were fraudulent in that they misrepresented Bethel Anesthesia and Bethel Interventional' s eligibility to collect PIP Benefits in the first instance.

365.     In fact, Bethel Anesthesia and Bethel Interventional never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibits "2" and "3", because they engaged in the unlawful and fraudulent conduct described herein.

366.     Bethel Anesthesia, Bethel Interventional, and Cho's charges for follow-up examinations identified in Exhibits "2" and "3" also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

367.     Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

368. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

369. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

370. Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient

examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

371. By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "2" and "3" suffered any injuries at all in their relatively minor automobile accidents, the injuries virtually always were -- at the outset -- minor soft tissue injuries such as sprains and strains.

372. By the time the Insureds in the claims identified in Exhibits "2" and "3" presented to the Bethel Anesthesia or Bethel Interventional for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

373. Even so, in the claims for follow-up examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely billed for their putative follow-up examinations under CPT code 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity, despite the fact that the purported examinations were provided many months after the Insureds' relatively minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the automobile accidents would have resolved.

374. For example:

(i)     On February 22, 2014, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, following a purported follow-up examination of SH by Cho on June 24, 2014 – over four months after the

accident – Cho and Bethel Anesthesia billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that SH presented with problems of moderate to high severity.

(ii)     On August 19, 2014, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that, although RC complained of shoulder pain, RC refused medical attention at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, following a purported follow-up examination of RC by Cho on September 29, 2015 – thirteen months after the accident – Cho and Bethel Interventional billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that RC presented with problems of moderate to high severity.

(iii)    On September 21, 2015, an Insured named NK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that NK's vehicle was drivable following the accident. The police report further indicated that NK was not injured and did not complain of any pain at the scene. In keeping with the fact that NK was not seriously injured, NK did not visit any hospital emergency room following the accident. To the extent that NK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, following a purported follow-up examination of NK by a nurse practitioner named Younjea Lee on May 23, 2016 – eight months after the accident – Lee, Cho, and Bethel Interventional billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that NK presented with problems of moderate to high severity.

(iv)     On August 11, 2016, an Insured named CY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that CY's vehicle was drivable following the accident. The police report further indicated that CY was not injured and did not complain of any pain at the scene. In keeping with the fact that CY was not seriously injured, CY did not visit any hospital emergency room following the accident. To the extent that CY experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, following a purported follow-up examination of CY by Cho on March 13, 2017 – over six and a half months after the accident – Cho and Bethel Interventional billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CY presented with problems of moderate to high severity.

(v) On October 9, 2018, an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, following a purported follow up examination of AH by Cho on November 1, 2019 – over a year after the accident – Cho and Bethel Interventional billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AH presented with problems of moderate to high severity.

375. These are only representative examples. In most of the claims for follow-up examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations – which often were many months or even years after the automobile accidents – or else their presenting problems were minimal.

376. In the claims for follow-up examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT code 99214, because follow-up examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

377. In the claims for follow-up examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho also routinely falsely represented that the Insureds

presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds

**b.** **Misrepresentations Regarding the Results of the Follow-Up Examinations**

378.    What is more, pursuant to the CPT Assistant, when Bethel Anesthesia, Bethel Interventional, and Cho submitted charges for their follow-up examinations under CPT code 99214, they represented that Cho or some other healthcare provider associated with Bethel Anesthesia or Bethel Interventional performed at least two of the following three components:  (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

379.    In actuality, however, in the claims for follow-up examinations identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

380.    Rather, following their purported follow-up examinations, Bethel Anesthesia, Bethel Interventional, and Cho simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds return for additional, medically unnecessary Fraudulent Services.

381.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatment by the Defendants, and to provide a false justification for the medically unnecessary treatment that the Defendants already had purported to provide, Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds

long after the relatively minor underlying automobile accidents had occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the accidents would have resolved.

382.    For example:

(i)     On February 22, 2014, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported follow-up examination of SH by Cho on June 24, 2014 – four months after the accident – Bethel Anesthesia and Cho falsely reported that SH continued to suffer from pain and range of motion deficits as the result of the accident, and recommended continued acupuncture treatment and that SH return to Bethel Anesthesia for a follow-up examination.

(ii)    On August 19, 2014, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that, although RC complained of shoulder pain, RC refused medical attention at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported follow-up examination of RC by Cho on July 2, 2015 – over ten months after the accident – Bethel Anesthesia and Cho falsely reported that RC continued to suffer from high levels of pain and range of motion deficits as the result of the accident, and recommended interventional pain management, continued conservative therapy, and that RC return to Bethel Anesthesia for a follow-up examination. Then, following a purported follow-up examination of RC by Cho on August 25, 2015 – over a year after the accident – Bethel Interventional and Cho falsely reported that RC continued to suffer from pain and range of motion deficits as the result of the accident, and recommended continued conservative therapy and that RC return to Bethel Interventional for a follow-up examination.

(iii)   On August 26, 2015, an Insured named EA was involved in an automobile accident. The contemporaneous police report indicated EA's vehicle was drivable following the accident. The police report further indicated that EA was not injured and did not complain of any pain at the scene. Later, on August 27, 2015, EA traveled on her own to North Shore-Long Island Jewish Emergency Department. The contemporaneous hospital records indicated that EA complained of neck pain. The hospital records further indicated that EA was briefly observed on an outpatient

basis and then discharged with nothing more than a neck strain diagnosis. To the extent that EA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported follow-up examination of EA by Cho on December 15, 2015 – over three months after the accident – Bethel Interventional and Cho falsely reported that EA continued to suffer from pain and range of motion deficits as the result of the accident, and recommended continued conservative therapy and that EA return to Bethel Interventional for a follow-up examination.

(iv)     On January 7, 2017, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision, and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured and did not complain of any pain at the scene. In keeping with the fact that SS was not seriously injured, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported follow-up examination of SS by a nurse practitioner named Younjea Lee on May 22, 2017 – over four months after the accident – Bethel Interventional, Cho, and Lee falsely reported that SS continued to suffer from pain and range of motion deficits as the result of the accident, and recommended continued conservative therapy, interventional pain management, diagnostic imaging services, and that SS return to Bethel Interventional for a follow-up examination.

(v)     On October 9, 2018, an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported follow up examination of AH by Cho on November 1, 2019 – over a year after the accident – Bethel Interventional and Cho falsely reported that AH continued to suffer from pain and range of motion deficits as the result of the accident, and recommended interventional pain management, continued conservative therapy, and that AH return to Bethel Interventional for a follow-up examination.

383.     These are only representative examples. In the claims for follow-up examinations identified in in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their relatively minor automobile accidents, often long after the accidents occurred.

384.    In the claims for follow-up examinations identified in in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**8.    The Fraudulent Charges for Pain Management Injections at the Bethel Practices**

385.    As part and parcel of the Defendants' fraudulent scheme, Bethel Anesthesia, Bethel Interventional, and Cho caused many of the Insureds in the claims identified in Exhibits "2" and "3" to be subjected to a series of pain management injections, including epidural steroid injections, transforaminal epidural steroid injections, and facet injections.

386.    Cho purported to perform virtually all of the pain management injections billed through Bethel Anesthesia and Bethel Interventional to GEICO.

387.    As set forth in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho billed the injections to GEICO, typically under CPT codes 62310, 62311, 62321, 62323, 64483, 64484, 64490, 64491, 64492, 64493, 64494 and/or 64495; and in many cases, Cho then billed separate facility fees for the injections through Hudson Terrace.

388.    As set forth below, the charges for pain management injections and facility fees were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subject to it.

389.    Moreover, in the claims for pain management injections identified in Exhibits "2" and "3", the charges for the pain management injections were fraudulent in that they

misrepresented Bethel Anesthesia and Bethel Interventional's eligibility to collect PIP Benefits in the first instance.

390.    Furthermore, and as set forth below, the Defendants' charges for the pain management injections and related facility fees also were fraudulent because they were the product of illegal self-referrals.

391.    As set forth above, Bethel Anesthesia and Bethel Interventional never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "2" and "3", because – as a result of the fraudulent scheme described herein – neither they nor the injections were in compliance with all significant laws and regulations governing healthcare practice.

a.    **Basic, Legitimate Use of Pain Management Injections**

392.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

393.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

394.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

395.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

396.     This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive pain management injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

**b.     The Medically Unnecessary Pain Management Injections**

397.     Like the charges for the other Fraudulent Services, many of the charges for pain management injections were fraudulent in that the pain management injections were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit, rather than to treat or otherwise benefit the Insureds.

398.     By the time the Insureds in the claims identified in Exhibits "2" and "3" presented to Bethel Anesthesia or Bethel Interventional for treatment, they either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were minimal.

399.     Even so, in the claims for pain management injections identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely provided pain management injections to Insureds who had been involved in relatively minor accidents – and who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections – months after the underlying accidents, and long after the Insureds' minor soft tissue complaints had resolved.

400.     For example:

(i)     On September 27, 2013, an Insured named HK was involved in an automobile accident. The contemporaneous police report indicated that HK's vehicle was drivable following the accident. The police report further indicated that HK was not injured and did not complain of any pain at the scene. In keeping with the fact that

HK was not seriously injured, HK did not visit any hospital emergency room following the accident. To the extent that HK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within three to four months of the accident. Even so, Bethel Anesthesia and Cho purported to provide HK with a medically unnecessary lumbar epidural steroid injection under CPT code 62311 on February 4, 2014 – more than four months after HK's accident, and long after any legitimate symptoms HK may have experienced as the result of the accident had resolved.

(ii)   On March 21, 2014, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JG's vehicle was drivable following the accident. The police report further indicated that, although JG complained of back pain, JG refused medical attention at the scene. In keeping with the fact that JG was not seriously injured, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within six to seven months of the accident. Even so, Bethel Anesthesia and Cho purported to provide JG with medically unnecessary lumbar transforaminal epidural steroid injections under CPT codes 64483 and 64484 on November 15, 2014 – between seven and eight months after the accident, and long after any legitimate symptoms JG may have experienced as the result of the accident had resolved.

(iii)  On August 19, 2014, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RC's vehicle was drivable following the accident. The police report further indicated that, although RC complained of shoulder pain, RC refused medical attention at the scene. In keeping with the fact that RC was not seriously injured, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a year of the accident. Even so, Bethel Interventional and Cho purported to provide RC with a medically unnecessary cervical epidural steroid injection under CPT code 62310 on August 22, 2015 – a year after the accident, and long after any legitimate symptoms RC may have experienced as the result of the accident had resolved.

(iv)   On December 9, 2014, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely

resolved within three to four months of the accident. Even so, Bethel Anesthesia and Cho purported to provide PK with a lumbar transforaminal epidural steroid injection under CPT code 64483 on April 4, 2015 – more than three months after the accident, and long after any legitimate symptoms PK may have experienced as the result of the accident had resolved.

(v)     On October 9, 2018, an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AH's vehicle was drivable following the accident. The police report further indicated that AH was not injured and did not complain of any pain at the scene. In keeping with the fact that AH was not seriously injured, AH did not visit any hospital emergency room following the accident. To the extent that AH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within four months of the accident. Even so, Bethel Interventional and Cho purported to provide AH with a cervical epidural steroid injection under CPT code 62321 on February 14, 2019, a lumbar epidural steroid injection under CPT code 62323 on March 2, 2019, a cervical epidural steroid injection under CPT code 62321 on March 16, 2019, cervical facet diagnostic injections under CPT codes 64490, 64491, and 64492 on August 3, 2019, lumbar facet diagnostic injections under CPT codes 64493, 64494, and 64495 on October 12, 2019, and lumbar facet diagnostic injections under CPT codes 64493, 64494, and 64495 on December 14, 2019, all of which were medically unnecessary. The medically unnecessary injections were administered between four months and fourteen months after the accident, and long after any legitimate symptoms AH may have experienced as the result of the accident had resolved.

401.    These are only representative examples. In many of the claims for pain management injections in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely submitted billing to GEICO for medically unnecessary pain management injections purportedly provided to Insureds who had been involved in relatively minor accidents – and who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury – months after the underlying accidents, and long after the Insureds minor soft tissue injuries had resolved.

**9.      The Fraudulent Charges for Fluoroscopic Guidance and Epidurography at the Bethel Practices**

402.    Not only did Bethel Anesthesia, Bethel Interventional, and Cho routinely bill GEICO for medically unnecessary pain management injections, but Bethel Anesthesia, Bethel

Interventional, and Cho also routinely and fraudulently unbundled separate charges for fluoroscopic guidance from the underlying injection charges, in a calculated effort to increase their billing for the injections.

403.    For example, and as set forth in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely unbundled separate charges of at least $1,500.00 for fluoroscopic guidance under CPT code 77003 from their underlying injection charges under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

404.    Pursuant to the CPT Assistant, fluoroscopic guidance is a component part of, and included in, charges for pain management injections under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

405.    As a result, healthcare services providers are not entitled to be reimbursed separately for fluoroscopic guidance under CPT code 77003 when billing for pain management injections under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

406.    Nevertheless, Bethel Anesthesia, Bethel Interventional, and Cho routinely unbundled billing for fluoroscopic guidance from the underlying injection charges so as to maximize the amount of fraudulent billing they could submit to GEICO.

407.    For example:

(i)     Bethel Anesthesia and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named HY on November 1, 2014.

(ii)    Bethel Anesthesia and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named KR on February 3, 2015.

(iii)   Bethel Anesthesia and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes

64483 and 64484 for injections purportedly provided to an Insured named HK on April 4, 2015.

(iv)    Bethel Anesthesia and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named EK on May 9, 2015.

(v)    Bethel Interventional and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named HY on October 27, 2015.

(vi)    Bethel Interventional and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from a charge under CPT code 64483 for an injection purportedly provided to an Insured named JJ on March 26, 2016.

(vii)    Bethel Interventional and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named SC on January 21, 2017.

(viii)    Bethel Interventional and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from a charge under CPT codes 64483 and 64484 for an injection purportedly provided to an Insured named SK on April 1, 2017.

(ix)    Bethel Interventional and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named GN on October 24, 2017.

(x)    Bethel Interventional and Cho unbundled a separate charge of $1,500.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named HL on March 6, 2018.

408.    These are only representative examples. Each of the unbundled charges for fluoroscopic guidance constituted a misrepresentation that Bethel Anesthesia, Bethel Interventional, and Cho were entitled to be reimbursed for the charge, when in fact they were not.

409.    Each of the unbundled charges for fluoroscopic guidance constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

410.     Similarly, in order to maximize their fraudulent charges for the medically unnecessary pain management injections, Cho and the Bethel Practices frequently submitted separate charges for fluoroscopic guidance and epidurography that supposedly was necessary to perform the injections.

411.     As set forth in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho submitted their charges for epidurography under CPT code 72275, typically resulting in a charge of between $750.00 and $2,000.00 for each instance when the epidurography supposedly was provided.

412.     Epidurography involves the injection of contrast dye under fluoroscopic guidance into the epidural space.

413.     Pursuant to the CPT Assistant, if epidurography is performed and billed under CPT code 72275, fluoroscopic guidance is considered to be included in the epidurography charges under CPT code 72275, and may not be billed separately under CPT code 77003.

414.     As a result, healthcare services providers are not entitled to be reimbursed separately for fluoroscopic guidance under CPT code 77003 when billing for epidurography under CPT code 72275.

415.     Even so, and as set forth in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho routinely unbundled billing for fluoroscopic guidance under CPT code 77003 from the underlying epidurography charges under CPT code 72275 so as to maximize the amount of fraudulent billing they could submit to GEICO.

416.     For example:

(i)     Bethel Anesthesia and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named EK on May 9, 2015.

128

(ii)     Bethel Anesthesia and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named YL on July 14, 2015.

(iii)    Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named EC on July 9, 2016.

(iv)    Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named HL on October 18, 2016.

(v)     Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named HL on June 18, 2016.

(vi)    Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SK on April 1, 2017.

(vii)   Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named GN on October 24, 2017.

(viii)  Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named JL on April 3, 2018.

(ix)    Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named VG on March 31, 2018.

(x)     Bethel Interventional and Cho billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SP on March 6, 2018.

417.    These are only representative examples. Each such charge constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.6.

**10.    The Fraudulent Charges for Spinal Surgical Procedures**

418.     As part and parcel of the Defendants' fraudulent scheme, Cho, Bethel Interventional, and Bethel Anesthesia also submitted fraudulent billing to GEICO for purported spinal surgical procedures.

419.     As set forth in Exhibits "2" and "3", these spinal procedures included foraminotomies, laminotomies, and discectomies, were billed through Bethel Interventional and Bethel Anesthesia under CPT codes 22551, 22633, 22634, 22842, 22845, 22851, 22853, 63030, 63035, 63047, 63048, and/or 64772, and often sought reimbursement in excess of $50,000.00 for each purported surgical procedure.

420.     To be qualified to participate in spinal surgical procedures, a physician typically must – at a minimum – complete a residency in orthopedic surgery or neurosurgery.

421.     Cho completed a residency in anesthesiology, and is board certified in anesthesiology with a pain management subspecialty.

422.     In the claims for spinal surgical procedures identified in Exhibits "2" and "3" that Cho, Bethel Interventional, and Bethel Anesthesia submitted to GEICO, Cho listed himself as an "assistant" surgeon.

423.     However, Cho was not qualified by training or education to serve as an "assistant" on the spinal surgical procedures.

424.     As set forth above, Cho's only legitimate board certificate is in anesthesiology. Cho is an anesthesiologist.

425.     Cho is not an orthopedic surgeon, a neurosurgeon, or any other type of surgeon.

426.     Nothing in Cho's training as an anesthesiologist qualified him to participate as a surgeon in spinal surgical procedures, whether as a primary surgeon or "assistant" surgeon.

427.    Cho's New Jersey Healthcare Profile – which is published on Office of the Attorney General Division of Consumer Affairs website – does not list any education or training that would qualify him to perform spinal surgical procedures, whether as a primary surgeon or "assistant" surgeon.

428.    To the extent that Cho actually did have some role in performing the spinal surgical procedures that were billed through Bethel Interventional and Bethel Anesthesia to GEICO, whether as a primary surgeon or "assistant surgeon", Cho's participation in the spinal surgical procedures without the appropriate training and education constituted a gross deviation from the standard of care, and rendered the spinal surgical procedures medically unnecessary and non-reimbursable under the No-fault laws. See N.J.S.A. 39:6A-2(m).

429.    In fact, Cho played no genuine role in performing the spinal surgical procedures that were billed through Bethel Interventional and Bethel Anesthesia to GEICO, either as a primary surgeon, "assistant" surgeon,  or otherwise.

430.    Even assuming that Cho was qualified to serve as "assistant surgeon" on the surgeries – and he was not – there was no medical necessity for Cho to participate in the spinal surgeries that were billed through Bethel Interventional and Bethel Anesthesia to GEICO. "Assistant" surgeons are not required to perform the types of spinal surgeries that were billed through Bethel Interventional and Bethel Anesthesia to GEICO.

431.    Cho's participation in these surgeries as an unqualified "assistant surgeon" was not due to medical necessity and constituted a gross deviation from the standard of care.

**11.    The Fraudulent Charges for Facility Fees at Hudson Terrace**

432. Not only did the Defendants fraudulently submit inflated charges for medically unnecessary services, but many of the Defendants' charges were the product of illegal self-referrals between and among Bethel Anesthesia, Bethel Interventional, Hudson Terrace, and/or Cho.

433. Many of the pain management injections identified in Exhibits "2" and "3" were provided at Hudson Terrace.

434. As set forth above, following many of the pain management injections identified in Exhibits "2" and "3", and above, GEICO not only would receive a bill from Bethel Anesthesia or Bethel Interventional for the injections, themselves, but – when the injections were performed at Hudson Terrace – GEICO also would receive a bill from Hudson Terrace for facility fees attendant to the pain management injections. Many of the charges for facility fees billed through Hudson Terrace, were for facility fees attendant to the Bethel Anesthesia and Bethel Interventional billing for pain management injections.

435. Cho referred or caused Insureds to be referred from Bethel Anesthesia and Bethel Interventional to Hudson Terrace for the pain management injections, and Cho had a significant beneficial interest in Hudson Terrace, inasmuch as Cho was an owner of Hudson Terrace.

436. All of the referrals that Cho made or caused to be made to Hudson Terrace for the pain management injections violated the Codey Law, because: (i) none of the referrals qualified for the ASC Exception, because the pain management injections did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia"; and (ii) the pain management injections were performed at Hudson Terrace, rather than at Cho, Bethel Anesthesia, or Bethel Interventional's medical office.

437. Specifically, the pain management injections did not qualify as "ambulatory surgery or procedures requiring anesthesia" because the anesthesia services were not required.

438.    What is more, and as set forth above, Hudson Terrace was a distinct facility that operated from a different location than Bethel Anesthesia.

439.    Similarly, and as set forth above, Hudson Terrace was a distinct facility that operated from a different location than Bethel Interventional.

440.    Hudson Terrace also had its own staff, who were employed by Hudson Terrace, rather than by Bethel Anesthesia or Bethel Interventional.

441.    As a result, the exception to the Codey Law for "medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office" did not apply to Cho's self-referrals to Hudson Terrace for pain management injections.

442.    Even so, Cho routinely and unlawfully self-referred Insureds to Hudson Terrace to generate facility fees attendant to the pain management injections, which he then billed to GEICO through Hudson Terrace.

443.    Many of the facility fees were not reimbursable at all, because – as set forth above – the facility fees were the product of illegal self-referrals.

444.    Even so, Cho routinely and knowingly submitted billing through Hudson Terrace to GEICO for facility fees attendant to their pain management injections, which fraudulently represented that Bethel Anesthesia and Bethel Interventional were entitled to collect facility fees pursuant to the illegal self-referrals, when in fact they were not.

**III.    The Fraudulent Charges the Defendants Submitted or Caused to be Submitted to GEICO**

445.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA–1500, NF-3 forms, and treatment reports through Bethel Anesthesia, Bethel Interventional, and Northern PT to GEICO, containing thousands of

fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

446.     The HCFA–1500, NF-3 forms, and treatment reports were false and misleading in the following material respects:

(i)     The HCFA–1500 forms, NF-3 forms, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants and the Fraudulent Services were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary, unlawful, and in some cases illusory Fraudulent Services; (b) the Defendants paid and received unlawful compensation in exchange for patient referrals; (c) the Defendants engaged in an unlawful self-referral scheme; (d) Bethel Anesthesia and Bethel Interventional were New Jersey medical entities that were not authorized to provide medical services in New York; (e) Bethel Anesthesia had an unlawful corporate structure; and (f) the Defendants routinely violated New York and/or New Jersey law by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA–1500 forms, NF-3 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iii)     The HCFA–1500 forms, NF-3 forms, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.     GEICO's Justifiable Reliance

447.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

448. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

449. Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants were engaged in an unlawful referral scheme.

450. What is more, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

451. Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

452. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full.

453. GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $4,900,000.00.

454.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Bethel Anesthesia, Bethel Interventional, and Northern PT
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

455.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

456.     There is an actual case in controversy between GEICO and Bethel Anesthesia, Bethel Interventional, and Northern PT regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO under New York no-fault insurance policies, seeking payment under the New York no-fault insurance laws.

457.     Bethel Anesthesia, Bethel Interventional, and Northern PT have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful scheme described herein.

458.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bethel Anesthesia, Bethel Interventional, and Northern PT have no right to receive payment for any pending bills submitted to GEICO.

459.     There also is an actual case in controversy between GEICO and Bethel Anesthesia, and Bethel Interventional regarding whether Bethel Anesthesia and Bethel Interventional were in compliance with all significant laws and regulations governing healthcare practice in New Jersey during the time period when billing for the Fraudulent Services was submitted to GEICO.

460.     Bethel Anesthesia and Bethel Interventional were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey, because of the fraudulent and unlawful activities described herein.

461.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Bethel Anesthesia and Bethel Interventional were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

## SECOND CAUSE OF ACTION
**Against Bethel Anesthesia, Bethel Interventional, and Cho**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A–1 et seq.))**

462.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

463.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibits "2" and "3", Bethel Anesthesia, Bethel Interventional, and Cho knowingly submitted or caused to be submitted HCFA–1500 forms, NF-3 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA–1500 forms, NF-3 forms, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants and the Fraudulent Services were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary, unlawful, and in some cases, illusory Fraudulent Services; (b) the Defendants paid and received unlawful compensation in exchange for patient referrals; (c) the Defendants engaged in an unlawful self-referral scheme; (d) Bethel Anesthesia and Bethel Interventional were New Jersey medical companies that were not authorized to provide medical services in New York; € Bethel Anesthesia

had an unlawful corporate structure; and (f) the Defendants routinely violated New Jersey law by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA–1500 forms, NF-3 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iii)    The HCFA–1500 forms, NF-3 forms, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

464.     Bethel Anesthesia, Bethel Interventional, and Cho's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

465.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,300,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRD CAUSE OF ACTION
**Against Cho**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

466.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

467.     Bethel Anesthesia is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

468. Cho has knowingly conducted and/or participated, directly or indirectly, in the conduct of Bethel Anesthesia's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Bethel Anesthesia was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Bethel Anesthesia was not in compliance with applicable statutory and regulatory requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

469. Bethel Anesthesia's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cho has operated Bethel Anesthesia, inasmuch as Bethel Anesthesia is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for Bethel Anesthesia to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Cho continues to attempt collection on the fraudulent billing submitted through Bethel Anesthesia to the present day.

470.     Bethel Anesthesia is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bethel Anesthesia in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

471.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted through Bethel Anesthesia.

472.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Cho, Northern PT, Mah, Choi, and Song**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

473.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

474.     Bethel Anesthesia is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

475.     Cho, Northern PT, Mah, Choi, and Song are employed by and/or associated with the Bethel Anesthesia enterprise.

476.     Cho, Northern PT, Mah, Choi, and Song knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Bethel Anesthesia's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or

cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Bethel Anesthesia was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Bethel Anesthesia was not in compliance with applicable statutory and regulatory requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

477.    Bethel Anesthesia's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cho has operated Bethel Anesthesia, inasmuch as Bethel Anesthesia is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Bethel Anesthesia to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bethel Anesthesia to the present day.

478.    Bethel Anesthesia is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bethel Anesthesia in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

479. Cho, Northern PT, Mah, Choi, and Song knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

480. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted through Bethel Anesthesia.

481. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Bethel Anesthesia and Cho
### (Common Law Fraud)

482. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

483. Bethel Anesthesia and Cho intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

484. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed

as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "2", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

485.    Bethel Anesthesia and Cho intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bethel Anesthesia that were not compensable under the New York and New Jersey no-fault insurance laws.

486.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $500,000.00 pursuant to the fraudulent bills submitted by Bethel Anesthesia and Cho through Bethel Anesthesia.

487.    Bethel Anesthesia and Cho's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

488.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.


**SIXTH CAUSE OF ACTION**
**Against Northern PT, Mah, Choi, and Song**
**(Aiding and Abetting Fraud)**

489.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

490.     Northern PT, Mah, Choi, and Song knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Bethel Anesthesia and Cho.

491.     The acts of Northern PT, Mah, Choi, and Song in furtherance of the fraudulent scheme include knowingly referring Insureds to Bethel Anesthesia for medically unnecessary Fraudulent Services in exchange for unlawful compensation from Bethel Anesthesia and Cho.

492.     The conduct of Northern PT, Mah, Choi, and Song in furtherance of the fraudulent scheme was significant and material. The conduct of Northern PT, Mah, Choi, and Song was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Northern PT, Mah, Choi, and Song to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Bethel Anesthesia.

493.     Northern PT, Mah, Choi, and Song aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Bethel Anesthesia for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

494.     The conduct of Northern PT, Mah, Choi, and Song caused GEICO to pay more than $500,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Bethel Anesthesia.

495.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

496. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Bethel Anesthesia and Cho
### (Unjust Enrichment)

497. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

498. As set forth above, Bethel Anesthesia and Cho have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO

499. When GEICO paid the bills and charges submitted or caused to be submitted through Bethel Anesthesia by Bethel Anesthesia and Cho for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Bethel Anesthesia and Cho's improper, unlawful, and/or unjust acts.

500. Bethel Anesthesia and Cho have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Bethel Anesthesia and Cho voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

501. Bethel Anesthesia and Cho's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

502. By reason of the above, Bethel Anesthesia and Cho have been unjustly enriched in an amount to be determined at trial, but in no event less than $500,000.00.

## EIGHTH CAUSE OF ACTION
### Against Cho
### (Violation of RICO, 18 U.S.C. § 1962(c))

503. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

504. Bethel Interventional is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

505. Cho have knowingly conducted and/or participated, directly or indirectly, in the conduct of Bethel Interventional's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Bethel Interventional was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Bethel Interventional was not in compliance with applicable statutory and regulatory requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3"

506. Bethel Interventional's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cho has operated Bethel Interventional, inasmuch as Bethel Interventional is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Bethel Interventional to function. Furthermore, the intricate planning required

to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Bethel Interventional to the present day.

507.     Bethel Interventional is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bethel Interventional in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault insurance billing.

508.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills submitted through Bethel Interventional.

509.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.


**NINTH CAUSE OF ACTION**
**Against Cho, Northern PT, Mah, Choi, and Song**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

510.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

511.     Bethel Interventional is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

512.     Cho, Northern PT, Mah, Choi, and Song are employed by and/or associated with the Bethel Interventional enterprise.

513.     Cho, Northern PT, Mah, Choi, and Song knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Bethel Interventional's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Bethel Interventional was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Bethel Interventional was not in compliance with applicable statutory and regulatory requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

514.     Bethel Interventional's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Cho has operated Bethel Interventional, inasmuch as Bethel Interventional is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Bethel Interventional to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and

continue to attempt collection on the fraudulent billing submitted through Bethel Interventional to the present day

515. Bethel Interventional is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bethel Interventional in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

516. Cho, Northern PT, Mah, Choi, and Song knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

517. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills submitted through Bethel Interventional.

518. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Cho and Bethel Interventional
### (Common Law Fraud)

519. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

520. Cho and Bethel Interventional intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

521.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "3", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

522.    Cho and Bethel Interventional intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bethel Interventional that were not compensable under the New York and New Jersey no-fault insurance laws.

523.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above–described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills submitted by Cho and Bethel Interventional through Bethel Interventional.

524.　Cho and Bethel Interventional's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

525.　Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Northern PT, Mah, Choi, and Song
### (Aiding and Abetting Fraud)

526.　GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

527.　Northern PT, Mah, Choi, and Song knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Bethel Interventional and Cho.

528.　The acts of Northern PT, Mah, Choi, and Song in furtherance of the fraudulent scheme include knowingly referring Insureds to Bethel Interventional for medically unnecessary Fraudulent Services in exchange for unlawful compensation from Bethel Interventional and Cho.

529.　The conduct of Northern PT, Mah, Choi, and Song in furtherance of the fraudulent scheme was significant and material. The conduct of Northern PT, Mah, Choi, and Song was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Northern PT, Mah, Choi, and Song to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Bethel Interventional.

530.     Northern PT, Mah, Choi, and Song aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Bethel Interventional for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

531.     The conduct of Northern PT, Mah, Choi, and Song caused GEICO to pay more than $800,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Bethel Interventional.

532.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

533.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Cho and Bethel Interventional
### (Unjust Enrichment)

534.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

535.     As set forth above, Cho and Bethel Interventional have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

536.     When GEICO paid the bills and charges submitted or caused to be submitted by Cho and Bethel Interventional for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Cho and Bethel Interventional's improper, unlawful, and/or unjust acts.

537. Cho and Bethel Interventional have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Bethel Interventional voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

538. Cho and Bethel Interventional's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

539. By reason of the above, Cho and Bethel Interventional have been unjustly enriched in an amount to be determined at trial, but in no event less than $800,000.00.

**THIRTEENTH CAUSE OF ACTION**
**Against Mah, Choi, and Song**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

540. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

541. Northern PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

542. Mah, Choi, and Song have knowingly conducted and/or participated, directly or indirectly, in the conduct of Northern PT's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Northern PT was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Bethel Interventional was not in compliance with applicable statutory and regulatory requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance

with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

543. Northern PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mah, Choi, and Song have operated Northern PT, inasmuch as Northern PT is not engaged in a legitimate chiropractic, physical therapy, and acupuncture practice, and acts of mail fraud therefore are essential in order for Northern PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Mah, Choi, and Song continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Northern PT to the present day.

544. Northern PT is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Northern PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

545. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through Northern PT.

546. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Mah, Choi, Song, Rim, Felderstein, Bethel Anesthesia, Bethel Interventional, and Cho
### (Violation of RICO, 18 U.S.C. § 1962(d))

547.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

548.    Northern PT is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

549.    Mah, Choi, Song, Rim, Felderstein, Bethel Anesthesia, Bethel Interventional, and Cho were employed by and/or associated with the Northern PT enterprise.

550.    Mah, Choi, Song, Rim, Felderstein, Bethel Anesthesia, Bethel Interventional, and Cho knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Northern PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Northern PT was not entitled to receive under the no-fault insurance laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Bethel Interventional was not in compliance with applicable statutory and regulatory requirements governing healthcare practice; and (iv) the Fraudulent Services were not provided in compliance with applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part,

in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

551.    Mah, Choi, Song, Rim, Felderstein, Bethel Anesthesia, Bethel Interventional, and Cho knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

552.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted through Northern PT.

553.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Northern PT, Mah, Choi, Song, Rim, and Felderstein
### (Common Law Fraud)

554.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

555.    Northern PT, Mah, Choi, Song, Rim, and Felderstein intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

556.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare

practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "1", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

557.    Northern PT, Mah, Choi, Song, Rim, and Felderstein intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Northern PT that were not compensable under the New York no-fault insurance laws.

558.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $3,600,000.00 pursuant to the fraudulent bills submitted by Northern PT, Mah, Choi, Song, Rim, and Felderstein.

559.    Northern PT, Mah, Choi, Song, Rim, and Felderstein's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

560.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Cho, Bethel Anesthesia, and Bethel Interventional
### (Aiding and Abetting Fraud)

561.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

562.     Cho, Bethel Anesthesia, and Bethel Interventional knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Northern PT, Mah, Choi, Song, Rim, and Felderstein.

563.     The acts of Cho, Bethel Anesthesia, and Bethel Interventional in furtherance of the fraudulent scheme include knowingly recommending the continued performance of the Fraudulent Services by Northern PT, and causing the billing to be submitted to GEICO and other insurers for the Fraudulent Services, despite their actual knowledge that the Fraudulent Services were medically unnecessary, and part of the Defendants' unlawful referral scheme.

564.     The acts of Cho, Bethel Anesthesia, and Bethel Interventional in furtherance of the fraudulent scheme include knowingly referring Insureds to Northern PT for medically unnecessary Fraudulent Services in exchange for unlawful compensation from Northern PT, Mah, Choi, and Song.

565.     The conduct of Cho, Bethel Anesthesia, and Bethel Interventional was significant and material. The conduct of Cho, Bethel Anesthesia, and Bethel Interventional was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there

would be no opportunity for Northern PT, Mah, Choi, and Song to obtain payment from GEICO and from other insurers.

566.     Cho, Bethel Anesthesia, and Bethel Interventional aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Northern PT for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

567.     The conduct of Cho, Bethel Anesthesia, and Bethel Interventional caused GEICO to pay more than $3,600,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Northern PT.

568.     Northern PT, Mah, Choi, Song, Cho, Bethel Anesthesia, and Bethel Interventional's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

569.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**Against Northern PT, Mah, Choi, Song, Rim, and Felderstein**
**(Unjust Enrichment)**

570.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 454 above.

571.     As set forth above, Northern PT, Mah, Choi, Song, Rim, and Felderstein have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

572.     When GEICO paid the bills and charges submitted or caused to be submitted through Northern PT by Northern PT, Mah, Choi, Song, Rim, and Felderstein for PIP Benefits, it

reasonably believed that it was legally obligated to make such payments based on Northern PT, Mah, Choi, Song, Rim, and Felderstein's improper, unlawful, and/or unjust acts.

573.    Northern PT, Mah, Choi, Song, Rim, and Felderstein have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Northern PT, Mah, Choi, Song, Rim, and Felderstein voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

574.    Northern PT, Mah, Choi, Song, Rim, and Felderstein's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

575.    By reason of the above, Northern PT, Mah, Choi, Song, Rim, and Felderstein have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,600,000.00.

## JURY DEMAND

576.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Bethel Anesthesia, Bethel Interventional, abd Northern PT, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Bethel Anesthesia, Bethel Interventional, and Northern PT have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Bethel Anesthesia, Bethel Interventional, and Cho, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,300,000.00, as well as: (i) treble damages; (ii) the costs and

counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.     On the Third Cause of Action against Cho, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Cho, Northern PT, Mah, Choi, and Song, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.     On the Fifth Cause of Action against Bethel Anesthesia and Cho, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Northern PT, Mah, Choi, and Song, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Bethel Anesthesia and Cho, more than $500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

H. On the Eighth Cause of Action against Cho, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I. On the Ninth Cause of Action against Cho, Northern PT, Mah, Choi, and Song, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J. On the Tenth Cause of Action against Cho and Bethel Interventional, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K. On the Eleventh Cause of Action against Northern PT, Mah, Choi, and Song, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L. On the Twelfth Cause of Action against Cho and Bethel Interventional, more than $500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M. On the Thirteenth Cause of Action against Mah, Choi, and Song, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Mah, Choi, Song, Rim, Felderstein, Bethel Anesthesia, Bethel Interventional, and Cho, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Northern PT, Mah, Choi, Song, Rim, and Felderstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Cho, Bethel Anesthesia, and Bethel Interventional, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

Q.      On the Seventeenth Cause of Action against Northern PT, Mah, Choi, Song, Rim, and Felderstein, more than $3,600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: January 31, 2022

RIVKIN RADLER LLP

By:      _____/s/ Max Gershenoff_____
            Barry I. Levy, Esq. (BL 2190)
            Max Gershenoff, Esq. (MG 4648)
            Christina M. Bezas, Esq. (CB 1230)
            926 RXR Plaza
            Uniondale, New York 11556
            (516) 357-3000

            *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

5673560.v1